Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL[1]

| | | |
|---|---|---|
| CONSEJO DE TITULARES DEL CONDOMINIO MONTE REAL<br><br>APELANTE<br><br>v<br><br>MAPFRE PRAICO INSURANCE COMPANY<br><br>APELADOS | KLAN202500197 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm. SJ2019CV09887<br><br>Sobre: Incumplimiento de Contrato; Mala Fe; Cumplimiento Específico; Violaciones al Código De Seguros De Puerto Rico; y Daños y Perjuicios Reclamación por Huracán María |

Panel integrado por su presidente, el Juez Bonilla Ortiz, el Juez Salgado Schwarz, y el Juez Pagán Ocasio.

Pagán Ocasio, juez ponente.

## SENTENCIA

En San Juan, Puerto Rico, a 7 de noviembre de 2025.

### I.

El 7 de marzo de 2025, el Consejo de Titulares del Condominio Monte Real (Consejo de Titulares o parte apelante) presentó un recurso de *Apelación* en el que nos solicitó que revoquemos la *Segunda Sentencia Enmendada* emitida por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI o foro primario) el 27 de noviembre de 2024, notificada y archivada digitalmente en autos el mismo día.[2] Mediante dicho dictamen, el TPI resolvió que MAPFRE Praico Insurance Company (MAPFRE o parte apelada) le debía pagar al Consejo de Titulares quinientos cuatro mil ochocientos cincuenta

---

[1] Ver Orden Administrativa OATA-2025-032.
[2] Véase la Entrada Núm. 379 del expediente digital del caso en el Sistema Unificado de Manejo de Caso del Tribunal de Primera Instancia (SUMAC-TPI).

y uno con noventa y ocho centavos ($504,851.98) en concepto de los daños evidenciados, siendo esta la cantidad neta adjudicada.

Junto al recurso, presentó una *Moción para elevar el original de los autos ante el Tribunal de Primera Instancia y la prueba admitida en la vista en su fondo* en la que solicitó que ordenáramos la elevación de la prueba admitida en el juicio en su fondo, así como los autos originales del caso.

También, la parte apelante presentó una *Moción solicitando autorización para exceder el número de páginas reglamentario* en la que solicitó que autorizáramos la presentación de la *apelación* en exceso del límite reglamentario de veinticinco (25) páginas.

Asimismo, presentó una *Solicitud para presentación de transcripción de la prueba oral* en la que solicitó que autorizáramos la presentación de la trascripción de la prueba oral (TPO) (testifical y pericial) desfilada durante el juicio en su fondo, celebrado los días 5, 6, 7, 8, 12, 13, 16, 19 y 20 de agosto de 2024.

El 7 de marzo de 2025, el Consejo de Titulares presentó una *Moción al amparo de la Regla 74(F) solicitando autorización para presentar un solo apéndice voluminoso* en la que solicitó que autorizáramos la presentación de una (1) copia impresa y dos (2) en discos compactos del apéndice, por resultar altamente voluminoso.

El 10 de marzo de 2025, el Consejo de Titulares presentó una *Moción informando cumplimiento con requisito de notificación de la apelación al Tribunal de Primera Instancia.*

El 13 de marzo de 2025, emitimos una *Resolución* en la que autorizamos la presentación del recurso en exceso del número de páginas reglamentarias. A su vez, declaramos No Ha Lugar la solicitud de elevar los originales de los autos debido a que el expediente se encuentra en el SUMAC. Asimismo, en vista de que la parte apelante utilizaría la Transcripción de prueba oral (TPO) como método de reproducción, le concedimos el término de treinta (30)

días para que remita copia a MAPFRE de la TPO estipulada. Además, se pormenorizó el trámite a seguir para el perfeccionamiento del recurso.

Ese mismo día, emitimos una *Resolución* en la que autorizamos la presentación de una copia impresa del apéndice del recurso y tres (3) en USB.

El 18 de marzo de 2025, el Consejo de Titulares radicó una *Moción en cumplimiento con la Resolución* en la que presentó los apéndices, según autorizados en la *Resolución* emitida el 13 de marzo de 2025.

El 21 de marzo de 2025, emitimos una *Resolución* en la que le ordenamos a la parte apelante el estricto cumplimiento de la *Resolución* emitida el 13 de marzo de 2025.

El 30 de abril de 2025, emitimos una *Resolución* en que le ordenamos a la parte apelante que, en vista de su incumplimiento con la *Resolución* emitida el 13 de marzo de 2025, en lo relacionado a la TPO, tenía tres (3) días para cumplir con lo ordenado.

El 2 de mayo de 2025, el Consejo de Titulares presentó una *Moción en cumplimiento de Resolución* en la que indicó que MAPFRE aún estaba revisando la TPO, por lo que no la había presentado de forma estipulada.

El 6 de mayo de 2025, emitimos una *Resolución* en la que le concedimos un término final hasta el 15 de mayo de 2025 para someter la TPO estipulada. De no estipularse, la parte apelada daría cumplimiento a la *Resolución* del 13 de marzo de 2025.

El 16 de mayo de 2025, la parte apelante y MAPFRE presentaron una *Moción conjunta en torno a la transcripción de prueba oral* en la que presentaron la TPO estipulada.

El 20 de mayo de 2025, emitimos una *Resolución* en la que acogimos la TPO y le concedimos a la parte apelante treinta (30) días para presentar su alegato. Además, le concedimos a la parte apelada

un término de treinta (30) días para radicar su alegato en oposición a partir de que la parte apelante presente su alegato.

El 27 de mayo de 2025, el Consejo de Titulares radicó una *Moción sometiendo transcripción de la prueba oral enmendada* en la que presentó la TPO estipulada, enmendada.

El 30 de mayo de 2025, emitimos una *Resolución* en la que le ordenamos a la parte apelante a cumplir con lo ordenado en la *Resolución* del 20 de mayo de 2025.

El 11 de julio de 2025, tras una prórroga concedida, el Consejo de Titulares presentó un *Alegato suplementario de la parte demandante-apelante,* que constaba de noventa y nueve (99) páginas. Junto a este, presentó una *Moción solicitando autorización para exceder el número de páginas reglamentario* para que autorizáramos la presentación del *Alegato suplementario* en exceso del término reglamentario de veinticinco (25) páginas.

El 15 de julio de 2025, en el ejercicio de nuestra discreción apelativa, emitimos una *Resolución* en la que declaramos No Ha Lugar la *Moción solicitando autorización para exceder el número de páginas reglamentario* y consecuentemente ordenamos el desglose del alegato suplementario por incumplir con lo establecido en nuestro reglamento, y concedimos a la parte apelante hasta el 1 de agosto de 2025 para presentar el alegato suplementario con hasta un máximo de treinta (30) páginas o, de lo contrario, se le tendrá por desistida la radicación de dicho escrito.

El 17 de julio de 2025, el Consejo presentó una *Solicitud de Reconsideración* de la *Resolución* emitida el 15 de julio de 2025, para que se autorizara la presentación del Alegato Suplementario en exceso del límite reglamentario de veinticinco (25) páginas, al fin de incluir en su alegato las referencias correspondientes a la TPO.

El 5 de agosto de 2025, emitimos una *Resolución* en la que declaramos No Ha Lugar a la Solicitud de Reconsideración y en la

que le concedimos a la parte apelante hasta el 15 de agosto de 2025 para cumplir con lo ordenado en términos del límite de páginas reglamentarias. De no cumplir, tendríamos el asunto por sometido en cuanto a la parte apelante.

El 15 de agosto de 2025, el Consejo presentó su *Alegato Suplementario y en solicitud de cumplimiento con la Resolución.*

Ese mismo día, el Consejo presentó una *Moción informativa* solicitando que este Tribunal tomara conocimiento judicial de la opinión emitida por el Tribunal de Distrito Federal para el Distrito de Puerto Rico en *Tolbert v. Cooperativa de Seguros Múltiples de Puerto Rico,* Misc. No. 24-0007 (ADC).

El 19 de agosto de 2025, emitimos una *Resolución* en atención al Alegato suplementario en la que le concedimos a la parte apelada un término de treinta (30) días para presentar su alegato en oposición.

El 12 de septiembre de 2025, MAPFRE presentó una *Moción al amparo de la Regla 73 (E) solicitando autorización para exceder el número reglamentarios de páginas en su Alegato de Oposición y autorización para unir prueba documental estipulada por ambas partes, que no fue incluida en el apéndice del apelante.* Su alegato constaba de setenta y cuatro (74) páginas.

El 16 de septiembre de 2025, emitimos una *Resolución* en la que declaramos No Ha Lugar dicha solicitud, y consecuentemente, ordenamos el desglose del alegato en oposición y concedimos a la parte apelada hasta el 30 de septiembre de 2025 para presentar el alegato en oposición conforme a lo requerido. De lo contrario, se le tendría por desistido de la radicación de dicho escrito. Por otro lado, autorizamos presentación de los exhibits conjuntos 6 y 7 mediante disco compacto.

El 19 de septiembre de 2025, MAPFRE presentó una *Moción de Reconsideración en cuanto a la Resolución* del 16 de septiembre de

2025, y solicitó la autorización para presentar su Alegato en Oposición para exceder el número de páginas reglamentarios.

El 23 de septiembre de 2025, emitimos una *Resolución* en la que declaramos Ha Lugar la *Moción de Reconsideración*, en la que concedimos a la parte apelada un término final hasta el 10 de octubre de 2025, para presentar su Alegato en oposición, el cual podría exceder de cincuenta (50) páginas. Lo anterior, en vista de que sería su primera expresión sustantiva sobre los méritos presente caso.

El 7 de octubre de 2025, MAPFRE presentó su *Alegato en Oposición,* en el cual sostuvo que el TPI no incurrió en los señalamientos de error imputados por la parte apelante. En consecuencia, solicitó que se confirme la *Segunda Sentencia Enmendada,* así como imposición de costas y honorarios de abogados a favor su favor conforme a la Regla 35.1 de Procedimiento Civil.

El 14 de octubre de 2025, el Consejo presentó una *Moción informativa* en la cual solicitó que se tome conocimiento judicial de la *Sentencia* emitida por el TPI en el caso de *Consejo de Titulares del Cond. Playa Azul II v. MAPFRE Praico Ins. Co., Caso Civil Núm. LU2019CV00216.* La parte apelante sostiene que su reclamación es similar a la de Playa Azul II, particularmente en lo relativo a partidas significativas para el arreglo o reemplazo de ventanas, puertas corredizas, sistema de techado y otros elementos comunes, por los daños ocasionados por el huracán María.

El 20 de octubre de 2025, MAPFRE presentó una *Moción en Oposición* a la Moción informativa presentada por el Consejo.

El 22 de octubre de 2025, emitimos una *Resolución* en atención a las posiciones de las partes sobre la solicitud de que se tome conocimiento judicial, en la cual resolvimos que el recurso de apelación sería resuelto conforme a derecho.

Contando con el beneficio de la TPO, el voluminoso expediente apelativo y las agurmentaciones de las partes, damos por perfeccionado el recurso de epígrafe, y, en adelante, pormenorizaremos los hechos procesales atinentes a la *Apelación.*

**II.**

El caso de marras tuvo su génesis el 19 de septiembre de 2019, cuando el Consejo de Titulares presentó una *Demanda* titulada "*Complaint*", contra MAPFRE reclamando indemnización por los daños ocasionados por el Huracán María.[3] Se solicitó cubierta bajo la póliza emitida por MAPFRE (núm. 54-CP-200005487-1) en favor del Condominio ubicado en la PR 181 Km. 1.8, San Juan, P.R. 00926, que cubría la estructura del Condominio por un límite agregado de trece millones, setecientos sesenta y nueve mil cuatrocientos ochenta y cuatro dólares ($13,769,484.00), y un deducible del 2% para tormenta de viento. Como consecuencia del Huracán María, el Condominio sufrió varios daños generados por los vientos y lluvia. Ante ello, el 13 de octubre de 2017, el Consejo, a través de su productor de seguros, Tomas Savona, presentó el reclamo a MAPFRE, asignado bajo el número de reclamación 20171278006.[4] MAPFRE asignó a Effective Claims Management, LLC., (Effective Claims) la evaluación de los daños reclamados.[5] El 16 de mayo de 2018, MAPFRE emitió y notificó su primera oferta pago por la suma de cuarenta y tres mil cuatrocientos veintinueve dólares y con noventa y nueve centavos ($43,429.99), por los daños valorados a raíz del huracán María, cantidad que fue rechaza por el Consejo.[6] El Consejo solicitó los servicios de WorldClaim ajustadores independientes para el proceso la reclamación. El 4 de septiembre de 2019, MAPFRE emitió una segunda oferta de pago por la suma

---

[3] Véase, Entrada Núm.1 en SUMAC-TPI.
[4] Véase, Anejos de la Entrada Núm. 305 en SUMAC-TPI.
[5] Véase, Apéndice del recurso, pág. 14.
[6] Véase, Anejos de la Entrada Núm. 305 en SUMAC-TPI.

de quinientos mil ochocientos ochenta y ocho dólares con setenta y nueve centavos ($500,888.79), la cual, una vez aplicado los deducibles correspondientes de la póliza, dicha oferta se redujo a doscientos veintinueve mil ochenta y cinco dólares con cincuenta y un centavos ($229,085.51). La parte apelante no acepto la referida oferta. [7]

Ante la disparidad en las cantidades, el Consejo solicitó que MAPFRE le pagara la cantidad de seis millones ($6,000,000.00) por los daños sufridos a la propiedad por el huracán María y seiscientos mil dólares ($600,000.00) por las violaciones al Código de Seguros de Puerto Rico, 26 LPRA sec. 101 *et seq.* En síntesis, la parte apelante alegó incumplimiento contractual por parte de MAPFRE, actuación de mala fe, así como su incumplimiento con las disposiciones del Código de Seguros de Puerto Rico, *supra*, específicamente en cuanto al plazo razonable para la adjudicación de reclamaciones. Además, reclamó el pago de intereses previos al juicio, costas procesales y honorarios de abogados.[8] El 21 de noviembre de 2019, el Consejo presentó la *Demandada Enmendada.*[9] Además, la parte apelante reiteró su alegación de que el 18 de septiembre de 2019, un (1) día antes de presentar su *Demanda,* había presentado el *Formulario de Notificación Previo a Entablar una Acción Civil a Tenor con el Artículo 27.164 del Código de Seguros de Puerto Rico.*[10]

El 13 de enero de 2020, la parte apelada presentó una *Contestación a Demanda Enmendada* en la que arguyó que no procedía la *Demanda* ante la falta de evidencia que acredite las alegaciones presentadas por el Consejo de Titulares.[11] Como defensa afirmativa, la parte apelada alegó que los daños reclamados en el

---

[7] Íd.
[8] Véase, Entrada Núm. 1 en SUMAC-TPI.
[9] Véase Entrada Núm. 14 en SUMAC-TPI.
[10] Véase, Entrada Núm.14 en SUMAC-TPI.
[11] Véase, Entrada Núm.29 en SUMAC-TPI.

caso de marras fueron consecuencia de los estragos provocados por los Huracanes Irma y/o María al pasar por Puerto Rico. A raíz de dichos eventos atmosféricos el Gobierno Federal declaró a Puerto Rico como zona de desastre, y el entonces Gobernador de Puerto Rico emitió una orden ejecutiva decretando un estado de emergencia. En virtud de lo anterior, la parte apelada argumentó que al haber recibido en un periodo de tres meses una cantidad de reclamaciones mayor a la que usualmente se tramita en un año, ello constituyó justa causa para cualquier tardanza en el proceso de ajuste de reclamaciones. Entre otras cosas, levanto como defensa afirmativa que el Consejo no mitigo daños; que los daños fueron exagerados, especulativos, infundados y excesivos, y que no actuó de forma temeraria, dolosa fraudulenta, culposa o negligente.

La parte apelada sostuvo además que los daños ocasionados por hongos y bacterias están expresamente excluidos de la cubierta de la póliza de seguros; aun cuando sea consecuencia de un evento por hongo cubierto por la póliza, quedan limitados a $15,000 según lo dispuesto en sus términos. Concluyendo así, que cualquier daño causado por agua, sin evidencia de daño físico a la estructura que fuese causado por el paso de una tormenta, no estaría cubierto bajo la póliza.[12]

El 5 de octubre de 2021, notificada digitalmente el próximo día, el TPI emitió una *Sentencia Parcial,* en la cual formuló las siguientes determinaciones de hechos:

1. El Consejo le pagó una prima anual de $23,164.00 a MAPFRE Praico Insurance Company y adquirió de la parte Demandada la Póliza de seguro Número 54-CP-200005487-1 (la "Póliza"), la cual cubría el período entre el 29 de marzo de 2017 al 29 de marzo de 2018.
2. El 20 de septiembre de 2017 el huracán María pasó sobre Puerto Rico.
3. Para el 20 de septiembre de 2017 la Póliza a favor del Condominio Monte Real estaba vigente.

---

[12] *Íd.*

4. El Consejo de Titulares del Condominio Monte Real presentó una reclamación ante MAPFRE por los daños que sufrió el Condominio a raíz del paso del huracán María. A dicha reclamación se le asignó el número 20171278006.

5. Mediante carta de 16 de mayo de 2018, MAPFRE preparó un ajuste por la suma de $43,429.99 tras ajustar la reclamación del Consejo.

6. La parte Demandada condicionó el pago de esos $43,429.99 a que el Consejo ejecutara un "Sworn Statement In Proof of Loss" de su reclamación.

7. El Consejo solicitó reconsideración de ese primer ajuste. Tras realizar un estimado revisado de $500,888.79, el 4 de septiembre de 2019, MAPFRE cursó a Monte Real un segundo ajuste de la reclamación incluyendo "desglose de pago, resumen y POL ["Proof of Loss"] para poder concluir con el caso de referencia" ofreciendo $229,085.51, luego de aplicar los términos y condiciones de la póliza.

8. El Consejo le solicitó a MAPFRE los $229,085.51 como un adelanto mediante carta de 26 de septiembre de 2019.

9. A solicitud de MAPFRE, ROV Engineering, PSC realizó un estimado con fecha de 9 de diciembre de 2020, en dónde concluyó que el Condominio sufrió daños atribuibles al Huracán María cuyos costos de reparación ascienden a $591,999.82. MAPFRE no ha realizado el ajuste de ese estimado ni le hizo al Consejo oferta alguna basada en esos números. Tampoco ofreció adelanto alguno atado a ese estimado.

En la referida *Sentencia Parcial* el TPI le ordenó a MAPFRE emitir un pago a favor del Consejo por la cantidad de $229,085.51, sin que fuera considerado como un pago en finiquito de la reclamación, y sin perjuicio al remanente de la reclamación del Consejo en dicho pleito.[13] El 25 de agosto de 2023, el TPI emitió una *Resolución* en la que le ordenó a la parte apelada el pago por los intereses generados de la Sentencia emitida el 5 de octubre de 2021.[14]

Con anterioridad a la celebración del juicio en su fondo, el 28 de septiembre de 2023, MAPFRE presentó una moción en la que solicitó la desestimación con perjuicio bajo toda causa de acción en violación al Art. 27.164 del Código de Seguros de Puerto Rico, *supra*, así, además, como de cualquier reclamación bajo la Ley 247-2018. Lo anterior, en virtud de falta de jurisdicción por el incumplimiento

---

[13] Véase, Entrada Núm.163 en SUMAC-TPI.
[14] Véase, Entrada Núm.256 en SUMAC-TPI.

de la parte apelante de no haber cumplido con el requisito de notificación previo a entablar una acción judicial.[15] El 19 de octubre de 2023, la parte apelante presentó una *Moción en Oposición.*[16] Consecuentemente, el 3 de noviembre de 2023, el TPI emitió una *Sentencia Parcial* en la que desestimó sin perjuicio la causa de acción bajo el Art. 27.164 del Código de Seguros de Puerto Rico, *supra.*[17]

El 29 de julio de 2024, el Consejo presentó una *Moción solicitando se tengan por autenticadas las fotografías a ser utilizadas en Juicio de conformidad con la Regla 902(K) de Evidencia* para que se tuvieran por autenticadas las fotografías a utilizarse en el juicio mediante el mecanismo de declaración jurada, conforme a la Regla 902 (K) de Evidencia, 32 LPRA Ap. VI, R. 902(K). Asimismo, solicitó que el TPI le ordenará a MAPFRE el reembolso de los gastos y honorarios de abogado, al amparo de la Regla 34.4 de Procedimiento Civil, por el incumplimiento de MAPFRE en conformidad a la Regla 33(a) de Procedimiento Civil, 32 LPRA Ap. V, R. 33(a)por negarse autenticar fotos. Fundamentó su petición en que: (1) MAPFRE no objetó el requerimiento, sino que lo contestó, (2) las admisiones solicitadas tenían un valor sustancial, ya que, sin ellas el Consejo se vería obligado a presentar prueba durante el juicio; (3) las contestaciones de MAPFRE carecían de justificadas válida; y (4) MAPFRE no expuso otra razón legítima para su negativa a autenticar.[18]

Previo al juicio, el 30 de julio de 2024, las partes presentaron una moción conjunta ante el TPI estipulando la cualificación de sus peritos.[19] Según la moción conjunta el señor Tom Irmiter, fue cualificado como perito del Consejo, en evaluación e identificación

---

[15] Véase, Entrada Núm.261 en SUMAC-TPI.
[16] Véase, Entrada Núm.265 en SUMAC-TPI.
[17] Véase, Entrada Núm. 267 en SUMAC-TPI.
[18] Véase, Entrada Núm. 311 en SUMAC-TPI.
[19] Véase, Entrada Núm. 314 en SUMAC-TPI.

de daños por vientos y agua, causalidad y estimación de costos de reparación y reemplazo, incluyendo opiniones correspondientes sobre el programa de Xactimate. El Ing. Roberto López Esquerra, perito del Consejo, fue cualificado como perito en evaluación e identificación de daños por viento y agua, causalidad, métodos y medios de reparación y precios en Puerto Rico, estimación de costos de reparación y reemplazo, incluyendo opiniones correspondientes sobre Xactimate, y cumplimientos con los códigos de construcción y estimados de costos de reparación. Por su parte, el Ing. William Rosario Chárriez perito de MAPFRE, fue calificado como ingeniero forense, especializado en evaluación e identificación de daños, causalidad y estimado de costos de reparación según la industria de la construcción en Puerto Rico.[20]

El 1 de agosto de 2024, MAPFRE presentó una *Moción en Oposición* a la solicitud de costas y honorarios relacionadas con su negativa a admitir un requerimiento de admisiones sobre la autenticación de varias fotos mediante el mecanismo de declaración jurada. [21] MAPFRE fundamentó su oposición en que: (1) las fotografías no constituían un "récord de negocios", siendo el proceso adecuado era presentar al testigo a declarar en juicio; y (2) el declarante carecía de conocimiento sobre las fotografías, ya que no fue quien las tomó ni participó en la inspección de todas las áreas.

El 2 de agosto de 2024, el TPI emitió una *Resolución* en la que declaró No Ha Lugar, la solicitud de la parte apelante en cuanto a la concesión de costas y honorarios de abogados al amparo de la Regla 34.4 de Procedimiento Civil, *supra,* por el alegado incumplimiento de MAPFRE en conformidad a la Regla 33 (a)

---

[20] Íd.
[21] Véase, Entrada Núm. 321 en SUMAC-TPI.

de Procedimiento Civil, *supra,* al alegadamente negarse autenticar las fotografías presentadas por el Consejo.[22]

El juicio en su fondo se llevó a cabo los días 5, 6, 7, 8, 12, 13, 16, 19 y 20 de agosto de 2024.[23] Durante el juicio, las partes presentaron abundante prueba testifical y documental. La prueba testifical del Consejo consistió en los testimonios del señor José L. Jiménez Domenech, titular y pasado Presidente de la Junta de Directores del Condominio Monte Real; el señor Andrew J. Fusco de WorldClaim; y el señor Dort Rothafel, gerente de operaciones de campo de FBS, con el propósito de autenticar fotos. Como peritos de la parte apelante se recibió el testimonio del señor Ing. Roberto López Esquerra, así como del señor Thomas Irmiter. Además, como testigo hostil, la parte apelante presentó al señor Omar Acevedo Avilés, Supervisor del Área de Reclamaciones de Propiedad de MAPFRE. Mientras que la prueba testifical de MAPFRE consistió en el testimonio de su perito, el Ing. William Rosario Chárriez de ROV, y el testimonio de su empleado el señor Omar Acevedo Avilés.

El 17 de octubre de 2024, el TPI emitió una *Sentencia* en la que determinó que, conforme a la prueba documental, y testifical presentada por el Consejo, no se acreditó la existencia de dolo ni mala fe por parte de MAPFRE en la tramitación de la reclamación, las ofertas de ajuste notificadas al Consejo se presumieron de buena fe. Además, determinó que MAPFRE que en la reclamación por incumplimiento contractual y por los daños y perjuicios derivados de dicho incumplimiento, la aseguradora no actuó temerariamente. El TPI razonó que hubo ausencia de prueba sobre cuáles fueron los daños específicos reclamados por el Consejo, desde que su productor de seguros presentó la reclamación ante MAPFRE el 3 de

---

[22] Véase, Entrada Núm. 323 en SUMAC-TPI.
[23] Véase, Entradas Núm. 326, 328, 329, 330, 331, 336, 340, 341, 342, 343 y 345 en SUMAC-TPI.

octubre de 2017 hasta que fue notificado el informe pericial de FBS y Entech [24]

Además, concluyó que la parte apelante no presentó evidencia suficiente sobre la cláusula de la póliza o la obligación incumplida por MAPFRE respecto al plazo de noventa (90) días para la resolución de la reclamación conforme al Código de Seguros de Puerto Rico, *supra*, y determinó que existía justa causa para la demora en resolver la reclamación. Asimismo, el TPI determinó que, aunque existía discrepancia sobre el alcance y el valor de los daños reclamados, hecho también reconocido por MAPFRE, la evidencia presentada por el Consejo no demostró que todos los daños incluidos en el informe pericial de FBS y Entech fueran consecuencia del Huracán María. Además, concluyó que dichos daños no se ajustaban a los términos y condiciones de la póliza, puesto que incluían partidas innecesarias, no cotizadas separadamente por los contratistas en Puerto Rico. También, la prueba estableció, que el material Danosa instalado en los techos tenía aproximadamente diez (10) años desde su instalación, y que varios techos presentaban problemas de filtraciones previo al Huracán María. Por tanto, el TPI no otorgó credibilidad al testimonio de los peritos del Consejo, el señor Imirter y el Ing. López Esquerra, ni a los estimados presentados por estos, así tampoco le brindó credibilidad al testimonio del señor. José L. Jiménez Domenech. A pesar de que el señor Jiménez testificó que se habían realizado reparaciones en los techos de los edificios 23, 24 y 25 en 2018 y en los techos de los edificios 7 y 9 en 2020, la parte apelante no presentó evidencia sobre su costo ni el alcance de dichas reparaciones. Ante ello, el TPI concluyó que no era creíble que todos los techos tuvieran daños iguales que requirieran reemplazo total

---

[24] Véase, Entrada Núm. 356 en SUMAC-TPI.

del material de Danosa, ni que estos fueran consecuencia directa del huracán María.

El TPI tampoco le otorgó credibilidad al estimado de reemplazo de las ventanas de los peritos del Consejo, ya que en el juicio se estableció que FBS y Entech, en casos similares suelen estimar el reemplazo del 80% o 100% de las ventanas sin identificar los apartamentos afectados ni los daños específicos. Del informe tampoco se desprendía dicha información. Además, el señor Irmiter basó sus determinaciones sobre la causalidad en las fotografías y notas tomadas por sus inspectores de FBS y los de Entech dos (2) años después del Huracán María, sin haber participado en las inspecciones, notas que no fueron presentadas por la parte apelante durante el juicio.

Por tanto, el foro primario consideró creíble el testimonio del perito de MAPFRE, el Ing. William Rosario Chárriez y el informe que este preparó en cuanto a los daños atribuibles al Huracán María. No obstante, aunque coincidió con sus conclusiones, el TPI incorporó ciertos costos del estimado presentado por la parte apelante con el fin de adjudicarle un mayor valor a dichas reparaciones en el estimado de costo de MAPFRE. Lo anterior, dado que ni el señor Joan Fernández, quien preparó dicho estimado ni los inspectores de ROV, quienes recomendaron las partidas, testificaron en el juicio.

Por consiguiente, el TPI determinó que el total de los daños, menos el dos por ciento (2%) del deducible, fue de $985,942.44, menos el pago parcial realizado por MAPFRE antes del juicio conforme a la *Sentencia Parcial* del 5 de octubre de 2021, por la cantidad de $229,085.51, resultando en una cantidad neta adjudicada de $756,556.93. En consecuencia, ordenó a MAPFRE pagar dicha cantidad al Consejo.[25]

---

[25] Íd.

El 18 de octubre de 2024, MAPFRE presentó una *Moción de Reconsideración parcial y/o de enmienda nunc pro tunc* correspondiente a la sentencia emitida por el TPI, argumentando que dicha sentencia contenía un error conceptual y matemático. En tal sentido, solicitó la corrección en la aplicación del deducible del 2%, para que se aplicara de la siguiente manera: $1,005,757.49 (cantidad total bruta concedida a la parte apelante), menos $271,820.01 (deducible aplicable a base del 2% del valor de la propiedad asegurada en aquellas estructuras donde se concedieron daños), menos $229,085.51 (pago parcial realizado antes del juicio), para un total de $504,851.97.[26]

El 28 de octubre de 2024, el Consejo presentó una *Moción Informativa,* en la que informó no oponerse a lo solicitado por MAPFRE.[27] No obstante, ese mismo día, el Consejo presentó un Memorando de Costas, mediante el cual le solicitó al TPI ordenar a MAPFRE el pago de $134,712.19 en conceptos de costas, al amparo de la Regla 44 de Procedimiento Civil, *supra,* así como el pago de los intereses correspondientes.[28]

El 29 de octubre de 2024, el TPI emitió una *Sentencia Enmendada,* mediante la cual le ordenó a MAPFRE pagar al Consejo la cantidad neta ajustada de $504,851.98, luego de aplicar correctamente el deducible del 2% de la póliza, y deducido el pago parcial realizado con anterioridad al juicio. Asimismo, declaró No Ha Lugar la demanda por incumplimiento de contrato, dolo, mala fe, así como la reclamación por daños y perjuicios. [29]

El 1 de noviembre de 2024, el Consejo presentó una moción para enmendar la *Sentencia Enmendada* y, en solicitud de reconsideración conforme a las Reglas 43 y 47 de Procedimiento

---

[26] Véase, Entrada Núm. 357 en SUMAC-TPI.
[27] Véase, Entrada Núm. 359 en SUMAC-TPI.
[28] Véase, Entrada Núm. 360 en SUMAC-TPI.
[29] Véase, Entrada Núm. 362 en SUMAC-TPI.

Civil, *supra,* R. 43 y R. 47. En síntesis, le solicitó al TPI que reconsiderara: (a) la eliminación de la frase "No Ha Lugar la Demanda del Consejo", por constituir un cambio sustantivo en la Sentencia Enmendada y ser contraria al resultado obtenido; (b) la imposición de costas u honorarios de abogados conforme a la Regla 44 de Procedimiento Civil, *supra; (c)* el ajuste de las determinaciones de daños bajo la cláusula de "Replacement Cost Value" (RCV) de la póliza y actualizar la cuantía otorgada bajo RCV, y no así bajo el "Actual Cash Value" (ACV), (d) la inclusión del impuestos Business to Business (B2B) en la reconstrucción de la propiedad; (e) la concesión honorarios de abogado conforme al Art. 27.165 del Código de Seguros de Puerto Rico, *supra*; (f) la valorización y apreciación de la prueba pericial; y (g) la reconsideración del incumplimiento de contrato, mala fe y dolo de MAPFRE.[30]

Ese mismo día, MAPFRE presentó una *Moción en Oposición* al Memorando de Costas presentado por el Consejo, en la que solicitó, además, que el TPI decretará la temeridad por parte del Consejo.[31]

El 25 de noviembre de 2024, MAPFRE presentó una *Moción en Oposición.* [32] En síntesis, solicitó que se diera por cumplida la orden dictada en cuanto a la *Sentencia Enmendada,* y que fuera denegada la solicitud de reconsideración presentada por el Consejo.

Consecuentemente, el 27 de noviembre de 2024, el TPI dictó una *Resolución* mediante la cual declaró parcialmente Ha Lugar la solicitud de reconsideración presentada por la parte apelante, en cuanto a la disposición final y los honorarios bajo el Artículo 27.165 del Código de Seguros de Puerto Rico, *supra.* En cuanto a lo demás fue denegado.[33]

---

[30] Véase, Entrada Núm. 365 en SUMAC-TPI.
[31] Véase, Entrada Núm. 364 en SUMAC-TPI.
[32] Véase, Entrada Núm. 378 en SUMAC-TPI.
[33] Véase, Entrada Núm. 380 en SUMAC-TPI.

Ese mismo día, emitió una *Segunda Sentencia Enmendada*, en la cual mantuvo, esencialmente, las mismas determinaciones de hechos formuladas en la Sentencia Enmendada.[34] En aras de economía procesal se reproducen únicamente las determinaciones de hechos que son pertinentes a los señalamientos de error.

[…]

5. El informe pericial de la parte demandante fue preparado por el Sr. Thomas J. Irmiter, Principal Ejecutivo de Forensic Building Science, Inc. y el Ing. Roberto López Esquerra, quien es el presidente de la compañía Entech Design and Project Management, PSC ("Entech").

6. Forensic Building Science, Inc., es una compañía fundada en el año 2004 sobre consultoría relacionada a la construcción. Provee evaluaciones sobre las condiciones de un edificio; inspecciones de ediciones por daños para determinar causalidad.

7. El ingeniero Roberto López Esquerra obtuvo un bachillerato en ingeniería civil de la Universidad de Puerto Rico, Recinto Universitario de Mayagüez en el 1999, y una maestría en gerencia de proyectos de la Universidad de Northwestern, en Illinois en el 2002.

8. El ingeniero López Esquerra funge como presidente de servicios de Entech desde el 2006 al presente; una firma que provee servicios de arquitectura, ingeniería, gerencia de proyectos, inspección y estudios ambientales especializados. Además, es CEO de MCP Group, LLC (MCP) una compañía de construcción que brinda servicios de contratista general para proyectos comerciales de construcción y remodelación.

[…]

16. El Ing. López Esquerra declaró que luego del huracán María ha inspeccionado sobre 300 propiedades; 78 de ellas con FBS.

17. Al presente su compañía utiliza Xactimate únicamente en los proyectos del programa de reconstrucción de vivienda del Departamento de Vivienda, ya que son fondos federales y se les requiere utilizar el programa de Xactimate.

18. Xactimate no garantiza que el costo para un producto sea el mismo en el mercado. Xactimate les pide a los usuarios que cotejen los precios en el mercado para mayor garantía.

[…]

20. El usuario es quien determina que partidas del programa Xactimate incorpora en el estimado.

21. Entech y FBS fueron contratados por los bufetes O'Neill & Borges y Raizner & Lee para redactar informes de daños y estimado de reparaciones para aproximadamente 78 reclamaciones judiciales en contra de aseguradoras por reclamaciones relacionadas al paso del Huracán María, incluyendo la del presente caso.

22. FBS fue contratado para evaluar la condición del Condominio Monte Real, establecer los daños causados

---

[34] Véase, Entrada Núm. 379 en SUMAC del TPI.

por el Huracán María, cuantificar los daños, preparar un alcance de reparación y un estimado para devolver la propiedad a su condición pre-pérdida.

23. El Sr. Irmiter inspeccionó la propiedad para el 15 de octubre de 2019. Entró a 4 unidades de vivienda y subió a 2 techos. La segunda vez que visitó la propiedad fue el domingo 4 de agosto de 2024, el día antes del comienzo del juicio.

24. El equipo de inspectores de FBS y Entech inspeccionaron el Complejo de Monte Real la semana del 5 de octubre de 2019.

[…]

26. Para inspeccionar el Condominio, los inspectores de FBS y Entech utilizaron las guías establecidas por la Sociedad Americana para Pruebas y Materiales (American Society for Testing and Materials, "ASTM" por sus siglas en inglés), en específico el estándar ASTME-2128-17, el cual plantea los principios básicos del método científico. Dichas guías no son mandatorias.

27. Según el Sr. Irmiter sobre cuál es el método científico respondió *que es cuando el entra a un edificio, buscar cuales son las circunstancias que causan el daño. Es un proceso de análisis de tendencia. Si el incidente es por el clima, comienza a analizar los datos del clima. Utilizando diferentes datos para determinar probabilidad.*

[…]

29. El hijo del Sr. Irmiter, Jim Irmiter fue quien escogió las fotografías para ser incluidas en el Informe pericial de FBS y Entech.

30. Ni los inspectores de FBS ni los inspectores de Entech realizaban determinación sobre causalidad. La determinación de causalidad fue realizada por el Sr. Irmiter y el Ing. López.

31. El Sr. Irmiter revisó los planos de construcción del edificio, las fotografías tomadas por los inspectores, las notas de campo de los inspectores e hizo una determinación de causalidad. Luego de hacer el análisis inicial, se lo pasa al informe al Ing. López Esquerra para su revisión y discusión. Posteriormente, se le devolvía el informe al personal de FBS para que verificara la caligrafía y luego se firma el informe por el Sr. Irmiter y el Ing. López.

32. El Sr. Irmiter declaró que el equipo de FBS y Entech solamente habían inspeccionado 75 apartamentos cuando emitieron su informe. Sin embargo, el Informe de FBS y Entech en su inciso 6.0 sobre "Interior Residential Units and Interior Common Areas Observation" identifica solamente 72 apartamentos inspeccionados.

33. En los estimados de Xactimate anejado al informe pericial, surge que hay 52 unidades con la nota de "Unit was not inspected by FBS or Entech personel. The following repairs are requiered for the removal and replacement of damaged windowa and door units" y 70 unidades que no contienen dicha nota, para un total de 122 apartamento. Por ende, según el estimado de Xactimate solamente se inspeccionaron 70 unidades.

34. El Clarification Addendum Addressing Unispected Units & Window Damages con fecha del 19 de octubre de 2020 dispone:

> "While we are not aware of any interior damages occurring from the storm event in these non-inspected units, replacement of storm damages

common area windows and doors will be required. [...]. Our estimate includes a reasonable allocation for repairs around the window and door openings. While this damage may not currently exist, this collateral damage will occur when the windows and doors are replaced. In other cases where is damage, the damage will increase during removal and replacement due to the nature of the materials involved. Based on the types of windows and doors and methods to install, removal of and replacement of windows and doors by the storm event will result in interior damages around and adjacent to the window and door rough opening" [...]

This clarification applies to the following units:

1-A, 1-B, 1-C, 2-A, 2-C,2-E, 2-F, 4-B, 5-C, 6-C, 7-B, 7-C, 7-D, 8-A, 9-C, 9-D,

10-A, 10-B, 11-B, 11-C, 14-D, 14-E, 15-C, 16-A, 16-E, 17-C, 19-D, 19-E, 20-

A, 20-B, 21-A, 21-B, 21-C, 22-B,22-E,23-C, 23-D, 24-B, 24-C, 24-D, 25-A, 25- B, 25-E, 25-F, 26-A,26-B,26-E, 27-A, 27-B, 27-E y 28-B.

35. En el informe de FBS y Entench no hay fotos provistas por los titulares de los apartamentos luego del paso del Huracán María, a pesar de que el Sr. Irmiter declaró haber visto fotos de tomadas por titulares.

36. Según el testimonio del Sr. Irmiter, las fotos de los 39 apartamentos inspeccionados por FBS y Entech posterior a la preparación del informe no se incluyen en el documento titulado Clarification Addendum. No obstante, de la prueba documental admitida no surge cuales fueron los apartamentos inspeccionados posteriormente ni prueba documental que acredite dichas inspecciones.

37. El estimado de Xactimate incluido en el informe pericial y el estimado de Xactimate incluido con el Clarification Addendum contiene la misma nota de "Unit was not inspected by FBS or Entech personal" en las mismas unidades.

38. El estimado de Xactimate incluido en el informe pericial y el estimado de Xactimate incluido con el Clarification Addendum contiene exactamente las mismas partidas y cantidades.

39. En el estimado de Xactimate incluida en el Clarification Addendum no hay un estimado para el apartamento 16 C. Según el estimado del apartamento 16C del estimado incluido en el informe pericial, surge que dicha unidad no fue inspeccionada y se le otorgó una partida de $11,567.41.

40. En el estimado de Xactimate incluida en el Clarification Addendum no hay un estimado para el apartamento 16 F. Según el estimado del apartamento 16F del estimado incluido en el informe, surge que dicha unidad no fue inspeccionada y se le otorgó una partida de $11,567.41. A pesar de que el estimado de dicho apartamento no surge del Xactimate incluido con el Clarification, las cantidades indicadas para dicho edificio permanecen inalterada en comparación con el estimado incluido en el informe pericial.

41. Para apartamentos que FBS y Entech no pudieron

inspeccionar y que no tenían fotos, el estimado incluye el remplazo de ventanas y puertas corredizas, a pesar de que no hay evidencia de daños. También se incluyen partidas incidentales relacionadas al remplazo de ventanas y puertas.

42. Según el informe de FBS y Entech en su inciso 6.1 sobre "Residential Unit Damage" se identificó daños a componentes eléctricos en los edificios 3 (modulo 7-8) por cables sueltos. Asimismo, se identificó daños al Edificio (modulo 11-12; edificio 8 (modelo 18-19-20) daños a componentes eléctricos, sin mencionar ni evidenciar con fotos en que consiste dicho daño. Tampoco surge como estos daños fueron causados por el Huracán María.

43.En apartamentos que los titulares indicaban que no sufrieron daños durante el Huracán María, los inspectores de FBS y Entech entraban a inspeccionar. Se incluye, además, un estimado de costos para estos apartamentos.

44. Durante las inspecciones de FBS y Entech, el personal les tomaba fotografías a todas las partes del edificio y a las unidades en su interior. Todas las fotografías fueron incluidas en el informe, aunque el daño no estuviere relacionado al huracán María.

45. Las fotos de FBS y Entech reflejan las condiciones del Complejo al momento de la inspección y no todos los daños que surgen de éstas están relacionadas al Huracán María.

46. El Ing. López Esquerra declaró que encontró daños normales en el Complejo Monte Real; no daños extremos.

47. El Ing. López Esquerra declaró que el estimado de Xactimate en permisologia presume que todos los trabajos los hará un contratista general.

48. El estimado de costos incluye gastos para permisología, a pesar de que según la Sección 3.2.4.1 del Reglamento Conjunta Para La Evaluación y Expedición De Permisos Relacionados Al Desarrollo, Uso De Terrenos y Operación De Negocios del 16 de junio de 2023 excluye las reparaciones contempladas en el informe de FBS y Entench, así como del Informe de ROV, de solicitar un permiso de construcción.

49. Las obras de construcción que no requieren permiso no están obligadas a contratar un inspector de obra. A pesar de esto, FBS y Entech incluyen una partida para la contratación de Inspector de Obra.

[...]

51. La responsabilidad de Entech [es] el estimado fue revisar las partidas incluida para comparar que fueran las partidas que surgen de su informe.

52. Las tareas que surge en el estimado de Xactimate son las que escoge el estimador en el programa, o sea el que entra la información al programa. En este caso, el estimador fue el Sr. Irmiter.

53. El precio de las ventanas no provino de la lista de precios de Xactimate. El precio por pies cuadrados fue provisto por la compañía Air Master en Puerto Rico.

54. El estimado de las ventanas de Air Master es para otro tipo de ventana; no para ventanas tipo Miami.

55. El ing. López Esquerra declaró que el desplazamiento de ventanas puede ocurrir por distintas razones. Cuando hay un desplazamiento de la ventana, el anclaje tiene que haber cedido algún grado. Para verificar si el anclaje cedió, la mejor manera es removiendo la ventana.

56. FBS ni Entench removieron ventanas para cotejar si hubo o no desplazamiento de ventana.

57. El ing. López Esquerra aceptó a preguntas de Mapfre que en su deposición declaró que si una ventana resiste un huracán y no muestra evidencia de daños no hay que cambiarla.

58. Los inspectores de ROV no encontraron ventanas sueltas.

59. Al Tribunal le mereció credibilidad el testimonio del Ing. Rosario Chárriez cuando explicó que el marco de la ventana es la parte más sólida y que menos fuerza hace contra el viento. Declaró que era difícil que el marco de una ventana se dañara pero que el centro de esta, que es la parte más débil, no se haya dañado.

60. El Ing. López Esquerra declaró que todas las habitaciones de todos los apartamentos en su estimado tienen una partida para remplazo de ventanas.

61. El Ing. López Esquerra declaró que en los estimados que ha preparado sin FBS no incluye una partida para inspector de obra.

62. El Ing. López Esquerra declaró que en los estimados que ha preparado sin FBS no concluye partidas a apartamentos no inspeccionados.

63. El Ing. López Esquerra declaró que en los estimados que ha preparado sin FBS no contienen una partida de manipulación de contenido. Tampoco hay una partida de cobertura por pintura. Tampoco incluye una partida para monitor de seguridad.

64. El Ing. López fue confrontado con un estimado realizado en un proyecto que inspeccionó sin FBS indicó que tampoco había partida en el estimado para permiso de construcción ni para la contratación de una firma de arquitectos.

65. En el informe de ajuste preparado por Wordclaim no se recomienda el remplazo del 80% de las ventanas del Complejo.

66. FBS y Entech asignaron una partida de manipulación de contenido a apartamentos no inspeccionados, a pesar de que desconocen si están ocupados y que mobiliario contienen.

67. Para los apartamentos no inspeccionados previo a la preparación su informe, el estimado de FBS y Entech incluye partidas de sobre 20 horas para manipulación de contenido, a razón de $37.50 por hora. Esto, a pesar de que se desconoce que contenido, si alguno, existe en dichos apartamentos.

68. Asimismo, el estimado de costo contempla partidas para desconectar y conectar la nevera a razón de $37.00 la hora y para desconectar y conectar enseres a $37.00 la hora.

69. El Ing. López indicó que el costo de Xactimate para dicha partida contempla la posibilidad de que se dañe el gabinete en el proceso de desconectar y conectar la nevera. Trabajo que no haría por ese costo para evitar que el dueño posteriormente le reclamó algún daño al enser eléctrico.

70. Aunque FBS indicó que los inspectores median las grietas, en el estimado todos los apartamentos inspeccionados tienen una partida de cinco (5) pies lineales por cada habitación para reparación de grietas.

71. Del informe pericial de FBS y Entech no surgen medidas de grietas.

72. Todos los apartamentos inspeccionados por FBS y Entech tienen un estimado idéntico de reparación de epoxy de 5 pies lineales de grietas por cada habitación.

Esto incluye dormitorios, baños, comedor, cocina y balcón.

73. El Complejo Monte Real fue pintado luego del huracán María y antes de la inspección de FBS y Entech.

74.El Sr. Irmiter indicó que la fachada del exterior del Complejo Monte Real estaba en buenas condiciones.

75. A pesar de que el Sr. Irmiter sabía que el Complejo fue pintado después del Huracán María no sabe cuánto se pagó por dicho trabajo.

76. En cuanto a las grietas del exterior de los edificios, el Sr. Irmiter declaró que quien pinto el edificio antes de la inspección de FBS y Entech, no identificó que la grieta era estructural y la empañeto con el material incorrecto.

77.Asimismo, el Sr. Irmiter declaró que el no sellar la grieta antes de que el contratista pintara el exterior de los edificios era algo que se hizo mal.

78.En el estimado de FBS no se desprende el lugar en donde la ventana esta dañada ni cual es el daño de esta.

79. El estimado de costos de FBS y Entech tiene una partida de Condiciones Generales para todos los apartamentos que asciende a $4,990.71.

80. Del testimonio del Ing. López no surge que las partidas incluidas en las condiciones generales de las unidades son esenciales para los trabajos de reparación que se requieren en el Complejo.

81. El estimado de daños de FBS y Entech utilizó los precios en el mercado según la aplicación de Xactimate para febrero de 2020. Su estimado asciende a $7,129,482.08. Este estimado es más del doble del estimado realizado por WorldClaim para abril de 2019. Hay un aumento de $3,670,151.19 en los daños reclamados.

82. El estimado de costos de FBS y Entech contienen partidas para la reparación de "posibles daños" que puedan ocasionarse durante el remplazó de ventanas y puertas corredizas. Asimismo, contiene partidas que no se cotizan de manera separada. También contiene partidas para la mano de obra que son mayores a lo que se paga en la construcción en Puerto Rico y partidas que no son necesarias para las reparaciones que requiere el Condominio. Es por ello, que entendemos que el estimado de costo esta sobre estimado y no refleja la realidad de los costos necesarios para las reparaciones que requiere el Complejo para devolverlo a su condición pre-pérdida.

83.El estimado de FBS/ Entech se desglosa de la siguiente manera:

| | |
|---|---|
| Edificio 1 (Modulo 1-2-3) | $469,607.80 |
| Edificio 2 (Modulo 4-5-6) | $482,093.58 |
| Edificio 3 (Modulo 7-8) | $451,479.72 |
| Edificio 4 (Modulo 9-10) | $409,892.29 |
| Edificio 5 (Modulo 11-12) | $385,155.86 |
| Edificio 6 (Modulo 13-14-15) | $483,402.97 |
| Edificio 7 (Modulo 16-17) | $311,025.56 |
| Edificio 8 (Modulo 18-19-20) | $481,878.98 |
| Edificio 9 (Modulo 21-22) | $307,188.16 |
| Edificio 10 (Modulo 23-24-25) | $821,022.29 |
| Edificio 11 (Modulo 26-27-28) | $740,707.59 |
| Áreas Comunes y Condiciones Generales | $624,676.83 |
| Impuestos, seguros, permisos y tarifa | $1,161,369.45 |

84. Según la sección 3.2 del Informe de FBS y Entech antes de la inspección se habían realizado reparaciones temporeras sobre remediación de agua a unidad individual; reparaciones temporales de techos; reparación y reemplazo de daños interiores causados por agua, incluyendo pintura y reparaciones de concreto; reparación y reemplazo de unidades de puertas y ventanas en ubicaciones seleccionadas. No obstante, entre los documentos inspeccionados por FBS/Entech solamente surge un estimado de Revolution Gardens con fecha del 17 de abril de 2019 por $1,500.00 y un invoice" para reparación de Ocasio's Slidding Door con fecha del 20 de noviembre de 2017 por la cantidad de $400.00.

85. El Sr. Irmiter declaró que dichas reparaciones eran temporeras porque no corregían el daño. No obstante, no hay prueba que establezca que los titulares hayan realizado dichas reparaciones para mitigar daño y que no fue una deficiencia en el trabajo realizado.

86. La Junta de Directores pagó en el 2018 por pintar todo el exterior de los edificios el mismo precio que fue cotizado en el 2015.

87. El ing. López Esquerra declaró que a un profesional de la construcción para octubre de 2021 se le pagaba entre $25 a $30 dólares la hora. A un obrero le pagaba $18.00 a $20 la hora. A un "foreman" o capataz se le paga $32.00 la hora. Asimismo, indicó que para esa fecha a un electricista se le pagaba $250.00 por día y a su ayudante $150 por día. A un plomero le pagaba entre $18 a $20.00 dólares por hora.

88. El Ing. Rosario Charriez declaró que en Puerto Rico a un "foreman" se le paga entre $30 a $40 la hora; a un obrero se le paga entre $12 a $15.00 dólares la hora; el pintor cobra entre $18 a $20 por hora y a un perito electricista se le paga $25.00 la hora.

89. El Ing. Rosario Charriez cuestionó la partida de electricista en el estimado de FBS y Entech cuando no se indica en el informe ningún problema o daño con el sistema eléctrico.

90. El Ing. Rosario Charriez cuestionó la partida de $288,486 por material peligroso en el estimado de FBS y Entech cuando no se indica en el informe que material peligroso se encontró en el complejo.

91. En Puerto Rico no hay un puesto de técnico de demolición. Si fuera necesario la demolición de una estructura, se contrata un obrero general.

92. El estimado preparado por FBS y Entech contiene una partida para gerente de proyecto, a razón de $62.50 por hora trabajada, para un promedio de $1,800.00 mensuales por solo 24 horas, más el "overhead and profit", por un periodo de 32 semanas para un total de $57,000.00

93. El Ing. López admitió que, para octubre de 2021, a un gerente de proyectos en Puerto Rico se le pagaba alrededor de $40.00 por hora.

94. El Tribunal le dio credibilidad al Ing. Rosario cuando declaró que las reparaciones que requieren el Complejo Monte Real no son de tal envergadura que requieran la contratación de un gerente de proyecto; que el Consejo puede contratar un "foreman" o capataz para supervisar las labores que conozca las prácticas de OSHA.

95. En Puerto Rico los contratistas no incluyen en sus estimados una partida de manejo o manipulación de contenido, ya que la práctica es mover los muebles hacia el centro de la habitación o se mueve a otra

habitación y se cubren con un plástico. El contratista incluye el costo de mover los muebles, de haberlos, en el costo del trabajo.

96. Según el informe de FBS y Entench los techos de todos los edificios (Building 1 al Buiding 11) (Module 1 al 28) tienen exactamente el mismo daño. Se reportó los siguientes daños:
- Displaced flashings
- Damage to the membrane
- De-bondes membrane
- Damage to electrical components
- Oxidation of metals
- Damages to metal roofing
- Water instrusion into top floor units, stemming from the roof
- Cracking to concrete on parapet walls

97. El informe de FBS y Entech reconoce que se realizó reparaciones "temporero" en el techo del edificio 2 (modulo 4-5-6). Sin embargo, del informe ni del testimonio surge cuando se realizaron dichas reparaciones. Según su testimonio, las reparaciones las catalogó como "temporeras" porque según su opinión no corrigen el daño.

98. Desde el año 2015 había problemas de filtraciones en el Edificio 10 (módulos 23,24 y 25).

99. El Sr. Irmiter no sabe cuándo se instaló el producto de Danosa en los techos del Complejo.

100. A preguntas de Mapfre, el Sr. Irmiter admitió que, según las condiciones del techo, él estimaba que el producto de Danosa fue instalado para el 2007.

101. Del producto de Danosa haber sido instalado para el 2007, el mismo tenía 10 años al momento del Huracán María. No hay evidencia del mantenimiento o reparación al producto de impermeabilidad ofrecido por el Consejo.

102. El Sr. Irmiter declaró que visito el apartamento 9F el 4 de agosto de 2024 y que observó que dicha unidad aún tenía problema de filtración de agua por el techo, y que los titulares utilizaban ollar y calderos para recolectar el agua que filtraba.

103. Sin embargo, según el testimonio del Sr. Jiménez, el tratamiento de Danosa del techo donde ubica el apartamento 9F fue remplazado en el año 2020.

104. ROV es una firma de Ingenieros consultores que brinda servicios de gerencia y manejo de proyectos de construcción, planificación, programa de itinerarios de construcción en función de tiempo y recursos, análisis económico y análisis y/o preparación de reclamaciones de construcción.

105. El grupo de inspectores de ROV asignado a este caso estaba liderado por el Ingeniero William Rosario Chárriez, licencia de ingeniería número 9284.

106. El Ing. Rosario Chárriez posee un Bachillerato en Ingeniería Eléctrica obtenido en la Universidad de Puerto Rico, Recinto de Mayaguez en el año 1983.

107. El Ing. Rosario Chárriez es miembro del Colegio de Ingenieros de Puerto Rico y ha realizado trabajos de construcción civil desde el año 2005 al presente.

108. El Ing. Rosario actualmente se desempeña como Gerente de Proyectos para la compañía Rely Corp.

109. Rely Corp., es una compañía de ingeniería y servicios de construcción civil, para la cual el Ing. Rosario Chárriez ha trabajado por los últimos 12 años. Las tareas del Ing. Rosario en Rely consisten en: (1) identificar clientes; (2) identificar proyectos; (3) hacer inspecciones; (4) preparar estimados de costos; (5)

preparar estimados de daños; (6) preparar propuestas para subastas; (7) subcontratar mano de obra; (8) comprar materiales y (9) facturar a los clientes.

110. Los trabajos de Rely son en su mayoría han sido en la renovación y construcción de salones de conferencias, bancos, baños, tiendas en centros comerciales, expansiones de edificios para almacén y muros de contención.

111. El Ing. Rosario rinde servicios a ROV Engineering Services, PSC desde el año 2018, en carácter de subcontratista a través de Rely.

112. El Ing. Rosario ha brindado los siguientes servicios a ROV: (1) inspección de propiedades y preparación de informes periciales para casos relacionados al Huracán María; (2) Gerencia de proyectos para la renovación de escuelas que sufrieron daños a consecuencias del Huracán María; (3) Gerencia de proyectos para restauración de edificios de PRIDCO que sufrieron daños a consecuencia del Huracán María.

113. El Ing. Rosario ha participado en la evaluación de daños a consecuencia del Huracán María en alrededor de 35 condominios, para los cuales fue inspector en alrededor de 5 y perito en aproximadamente 30.

114. El Ing. Rosario acudió al Complejo para familiarizarse con la propiedad y observa sus condiciones. Su visita duró aproximadamente 6 horas. Visito 2 o 3 apartamento para conocer cómo eran en su interior. Caminó por el estacionamiento, casa club, caseta de seguridad, área de basura, verjas y área de juegos. No pudo lograr acceso a los techos, ya que no tenía una escalera y no se puede acceder a través de los apartamentos.

115. El ing. Rosario Chárriez indicó que cuando visitó el Complejo encontró pocos daños relacionados al huracán y que los apartamentos que visito estaban en buenas condiciones. Indicó que encontró solo un 10% de deterioro en el trabajo de la pintura.

116. ROV y el personal de Forensic Building Services realizaron inspecciones durante los días 2 al 5 de octubre de 2019, 13 al 18 de julio de 2020, 4 al 5 de septiembre de 2020 y el 7 de noviembre de 2020.

117. El grupo de ROV está compuesto de 7 u 8 personas, cuyo líder de grupo siempre es ingeniero. Los demás inspectores conocen de ingeniería o son personas con experiencia en ese tipo de inspecciones porque son ajustadores.

118. La metodología de inspección de los inspectores de ROV"

a. Se presentaban al Condominio previamente para coordinar las inspecciones.

b. Se solicitaba la lista de los apartamentos disponibles para inspección y los horarios.

c. Se dividen en dos (2) grupos, unos para inspeccionar los apartamentos y otro para las áreas exteriores.

d. Los inspectores hacían preguntas básicas a la persona que los recibía en cada apartamento, para conocer si estuvieron presentes durante el huracán, y si habían observado algún daño, entre otras.

e. Los inspectores visitaban todas las áreas del apartamento, tratando de identificar daño en puertas, ventanas, filtraciones, etc.

f. Los inspectores tomaban fotografías de los daños identificados.

g. El inspector recoge los datos encontrados en una hoja de papel y documentaba los hallazgos, tales como el estado de la pintura, estado del techo, cantidad de puertas y ventanas dañadas por cada habitación y cada apartamento.

h. Los inspectores ingresaban toda la información anotada en dicha hoja a una tabla Excel y colocaban las fotografías tomadas en un portal de forma ordenada por apartamento y área.

i. Luego de las inspecciones, el líder de grupo preparaba una tabla de Excel consolidando lo plasmado por los inspectores en sus respectivas tablas.

119. ROV inspeccionó unos 117 apartamentos de los 122 que componen el Complejo Condominio Monte Real y sus áreas comunales. Los 5 restantes no fueron inspeccionados porque no se pudo contactar al dueño y/o rechazaron la inspección.

120. Toda la información que los inspectores de ROV recogieron en sus notas de campo la incluyeron en una tabla de Excel que detallaba las áreas inspeccionadas, los daños la dimensión de estos y la acción correctiva a realizarse.

121. El Sr. Joan Fernández, un empleado de ROV con dominio en el programa de Xactimate convirtió el documento de Excel a Xactimate para contabilizar y estimar los daños y de esta forma generar el estimado de daños de MAPFRE.

122. El Sr. Joan Fernández paso íntegramente la información sobre la ubicación y el daño a la aplicación de Xactimate.

123. El Ing. Rosario miró la tabla de Excel y el estimado de Xactimate y pudo corroborar que la información que está en ambos lugares es la misma.

124. El Ing. Rosario Chárriez preparó un informe pericial sobre el Condominio Monte Real con fecha del 9 de diciembre de 2020.

125. Para preparar el informe pericial, el Ing. Rosario miró la tabla de Excel consolidada por el líder de grupo, las notas de campo de los inspectores, las fotografías tomadas por estos y el estimado en Xactimate.

126. Además, el Ing. Rosario utilizó como referencia los reportes de la NOAA e imágenes de Google Earth para conocer y comparar las condiciones de los techos del Condominio antes y después del Huracán María. También estudio el reporte de FBS y Entech.

127. El Ing. Rosario no utiliza la totalidad de las fotografías tomadas por los inspectores de ROV en su informe pericial. Solamente incorpora una foto representativa del lugar en su informe para no hacer su informe demasiado largo y porque la parte demandante tenía el acceso a la totalidad de las fotografías tomadas por los inspectores.

128. El programa Xactimate no garantiza la corrección de los precios suplidos. Además, recomienda que el usuario corrobore la corrección de los precios con el mercado local para el estimado resultante sea preciso.

129. El Sr. Irmiter reconoció que en Puerto Rico los contratistas no usan el programa de Xactimate para hacer sus estimados.

130. Según el informe pericial del Ing. Rosario Chárriez, el Apartamento #19E estaba siendo reparado al momento de la inspección conjunta de ROV y FBS. No se presentó evidencia de estimado, factura ni recibos de pago relacionada a dichas reparaciones.

131. Según el informe pericial del Ing. Rosario Chárriez,

el Apartamento #20A estaba siendo reparado al momento de la inspección conjunta de ROV y FBS. No se presentó evidencia de estimado, factura ni recibos de pago relacionada a dichas reparaciones.

132. Según el informe pericial del Ing. Rosario, el Apartamento #25A estaba siendo reparado al momento de la inspección conjunta de ROV y FBS. No se presentó evidencia de estimado, factura ni recibos de pago relacionada a dichas reparaciones.

133. Según el informe pericial del Ing. Rosario, los dueños de los apartamentos número #1C, #2F, #4B, #5D, #6B, #10A, #19D, #22E, #26E reportaron no haber sufrido daño.

134. El Ing. Rosario Chárriez no incluye en su informe estimado de daños para aquellos apartamentos que el equipo de ROV no pudo entrar para inspeccionar. Tampoco hay estimados de daños en apartamentos donde el titular o residente indicó que no sufrió daños por el Huracán María.

135. Según el informe pericial del Ing. Rosario no se observó roturas significativas en elementos como puertas, ventanas y techos que facilitaran el acceso de agua hacia el interior de la estructura. Tampoco se observó pérdidas totales en ninguno de los elementos de la estructura o sus apartamentos.

136. Las reparaciones necesarias en el Complejo son menores, consistente en pintura interior y algunas áreas del exterior, reparaciones de algunas ventanas y puertas, y reparación de algunos elementos comunes del edificio.

137. Según el informe pericial del Ing. Rosario Chárriez hubo áreas del edificio en las cuales no se observaron daños, tales como: aceras, portón eléctrico, estación de buzones, jardines, generador eléctrico, área de juegos de niños y estacionamiento.

138. Los peritos de la parte demandante estimaron el costo para una firma de arquitectura e ingeniería en $477,448.93. Sin embargo, el Tribunal no recibió prueba alguna que estableciera la razón por la cual sería necesario incurrir en este gasto, máxime cuando las reparaciones sugeridas por los propios peritos del Consejo (sellado de techo, ventanas, puertas, losetas, grietas y pintura) no requieren diseños, planos ni construcción nuevos.

139. Tampoco se pasó prueba sobre que fuera obligatorio la contratación de un Inspector de Obras o que el Consejo contratare uno cuando han realizado trabajos de reparación en el complejo.

140. El Ing. López Esquerra fue confrontado con un informe pericial y estimado de daños que selló y suscribió en otro caso donde FBS no participó, que no incluye partidas para unidades no inspeccionadas, sino que se limita a mencionar "no access" para cada apartamento no inspeccionado. A pesar de que en aquel caso las reparaciones que se sugieren son similares a las de este caso (cambio de ventanas, sellado de techo, empañetado y pintura), no se incluyeron las mismas partidas de condiciones generales ni los gastos incidentales que se incluyen en el estimado para esta propiedad.

141. El Ing. López admitió que en Puerto Rico no se cotizan los precios de pintura de la manera en que los muestra Xactimate. En las cotizaciones de pintura no se incluye un desglose de partidas por precios incidentales.

142. En Puerto Rico, un contratista de pintura engloba

todas las partidas que entiende necesarias y provee una cotización por el total

143. En Puerto Rico actualmente se trabaja con el Código de Construcción de 2018.

144. El Sr. Irmiter no ha sido contratado como contratista ni ha realizado trabajos de construcción en Puerto Rico.

145. Según el currículo vitae del Sr. Irmiter, éste no ha trabajado como contratista desde el año 2000.

146. La lista de precios utilizada por el FBS y Entech en su informe de ajuste corresponde a febrero de 2020, mientras que la lista de precios utilizadas por ROV es a septiembre de 2018.

147. Se tomo conocimiento judicial de las sentencias en los casos Consejo De Titulares Del Condominio Bahía Del Mar v. Mapfre Praico Insurance Company, AU2019CV00515 y del caso Consejo de Titulares del Condominio De Diego 444 v. MAPFRE Praico Insurance Company, SJ2019CV09012. En ambos casos, así como en el de autos, el Sr. Irmiter indicó que identificó en el 80% de las ventanas algún daño con respecto a los conjuntos de ventanas.

148. A pesar de que los peritos del Consejo declararon que su estimado contiene el remplazo de solo el 80% de las ventanas y puertas corredizas del Condominio, todas las habitaciones de todos los apartamentos incluyendo partidas que estos indican son incidentales al reemplazo de puertas corredizas y ventanas.

149. La recomendación de remplazó para el 80% de las ventanas del Complejo fue realizada a pesar de que los inspectores de FBS y Entech solamente había inspeccionado 70 de los 122 apartamentos.

150. Del Informe pericial no surge de cuales apartamentos se recomienda el remplazo de ventanas ni el daño específico que sufrió cada ventana. Tampoco del informe pericial surge medidas sobre el desplazamiento del marco en las ventanas.

151. En el estimado de Xactimate, FBS y Entech incluye un estimado para las escaleras de cada edificio, cuando del informe pericial no surge cual es el daño específico sufrido en las escaleras de cada edificio como consecuencia del huracán María. El informe pericial se limita a indicar de manera general los siguientes daños a escaleras y exteriores comunes: "water damaged ceiling and walls, damaged grout on floor tiles, damaged floor tiles, cracking to concrete walls and ceiling and damaged electrical components".

152. Del informe pericial no surge cuales daños a la loza de las escaleras fueron descartadas por el uso, ya que dichos edificios no tienen ascensores y no paso prueba sobre si las mismas han sido reparadas desde que se construyó el edificio para el 1988. No obstante, según el estimado de costos de FBS y Entech para las escaleras comunes de todos los edificios aparenta incluir el remplazo de la totalidad de la loza.

153. El Sr. José Jiménez Domenech es titular del apartamento 25F de Complejo de Monte Real desde el año 1991; cuando compró del titular anterior. Desde entonces ha residido en dicho apartamento de forma ininterrumpida hasta el presente.

154. El Sr. Jiménez Domenech fungió como presidente de la Junta de Condóminos de Monte Real por varios términos desde el año 2013 al año 2019 de forma ininterrumpida.

155. Durante los años 2013 al 2019, el Consejo no contaba con un administrador, por lo que el Sr. Jiménez

como Presidente de la Junta de Directores, estaba al tanto de los asuntos importantes del Consejo, de manera que tuvo y tiene conocimiento del mantenimiento de las áreas comunes y techos del complejo.
[...]

157. El Sr. Jiménez Domenech indicó que aproximadamente cada 3 meses se limpiaban los techos con agua, detergente y escoba. Para subir a los techos se requiere una escalera o grúa, ya que no se tiene acceso a través de los apartamentos.

158. La parte demandante no presentó evidencia dé cuándo fue la última vez que se le dio mantenimiento al producto de impermeabilidad instalado en los techos del Complejo.
[...]

173. El Consejo no tiene conocimiento sobre las gestiones específicas que hicieron el Sr. Sabona para tramitar la reclamación.

174. El Sr. Jiménez manifestó que, a un mes de la reclamación, el representante de Mapfre llegó al Complejo. Declaró que lo llevo por todo el complejo. Que, durante la inspección, el representante de Mapfre le tomaba foto y realizaba notas a todo lo que el Sr. Jiménez le señalaba como daños.

175. Luego de dicha inspección, el Sr. Jiménez indicó haber recibido un cheque de $43,429.99 como ajuste de la reclamación. Indicó que llamó al Sr. Sabona para indicarle que no aceptaría el cheque.

176. El ajuste de $43,429.99 realizado por Mapfre contiene partida para reparaciones en los apartamentos 7-D, 2D, 3A, 3B, 7F, 9F, 12C y 12F del edificio 1 según la póliza. Asimismo, tiene una partida para los apartamentos 14C, 15C, 16D, 18B, 19A, 19C, 19 F, 23 D y 23F del edificio 2 según la póliza. En el edificio 3 según descrito en la póliza, el ajuste tiene una partida para reparación en los apartamentos 26B, 27C, 27F, 28C, y 25C. También tenía una partida para el edificio 12 según la póliza que incluye la verja de concreto que demarca el perímetro, bloque de concreto, cerco con parrilla de hierro, y la verja de tela metálica "cyclone fence". El ajuste tenía una partida para el remplazo de la verja de madera en los apartamentos 1-A, 2-D, 4-A, 5-A, 7-A, 7-D, 9-A, 9-D, 10-A, 11-A, 12-D, 13-A, 14-D, 16-D, 19-D, 20-A, 21-A, 22-A, 22-D, 23-A, 23-D, 24ª, 25-A, 25-D, 26-A, 27-D y 28-A. . . .

177. Para la fecha de la primera oferta de ajuste notificada por Mapfre, el Consejo no había presentado ninguna documentación o estimado a la aseguradora.

178. El 18 de julio de 2018, Mapfre le notificó una misiva al Condominio Monte Real mediante la cual le indican que para atender su solicitud de reconsideración del ajuste del 16 de mayo de 2018 necesitaban que le enviaran una lista de las partidas omitidas o en controversia. También le exhortaban a acompañar estimado, cotizaciones, factura o fotos adicionales para evaluar su solicitud.

179. Mediante carta con fecha del 19 de julio de 2024, notificada a MAPFRE el 23 de julio de 2018, el Condominio a través del Sr. José L. Jiménez y The Fusco Group Partners, Inc (d/b/a WorldClaim) a través del Sr. Filiberto Fernández, le informaron a MAPFRE que el último habría de representar, asesorar

y asistir al Consejo *"in the opening and/ or reopening of this loss adjustment, claim and any related matter"*.

180. El Condominio no envió documento a Mapfre hasta abril de 2019, cuando Worldclaim le notificó a Mapfre su informe con la reclamación.

181. El 27 de septiembre de 2018, el ajustador Luis Bon Nazario le notificó al Condominio Monte Real que cerraba su solicitud de reconsideración al no proporcionar la información necesaria para sostener su reclamo. A esa fecha, el Consejo no había presentado la documentación requerida por Mapfre mediante misiva del 16 de julio de 2018.

182. Aun cuando la referida carta indicaba que la reclamación se cerró, la aseguradora continúo trabajando la reclamación del Consejo cuando recibió el informe de WorldClaim.

183. El Sr. Jimenez Domenech indicó que Mapfre realizó otra oferta de ajuste a base de la reclamación realizada por Worldclaim, que también fue rechazada por la Junta de Directores.

184. La Junta de Directores no llevo a asamblea ninguna de las dos (2) ofertas de ajuste realizada por Mapfre.

185. La parte demandante no presentó en evidencia documento alguno sobre la reclamación radicada por el Sr. Sabona a la aseguradora y cuáles fueron los daños allí reclamados.

[...]

188. El Sr. Jimenez declaró que antes del paso del huracán María, los techos de los edificios de Monte Real se sentían lisos, planos y cuando se pisaba se sentía normal como cualquier piso sólido. Pero que, luego del paso de dicho huracán, los techos no estaban como originalmente estaban, ya que tenían burbujas y cuando éste caminaba sobre ellos, hacía un ruido y que no eran planos.

189. No obstante, el Sr. Jimenez tuvo que admitir a preguntas de MAPFRE, que antes del huracán María, para el año 2015 la Asamblea del Complejo había decidido pintar los edificios y áreas comunes. También se había decidido hacer una derrama para trabajo en los techos en los edificios 23,24 y 25.

190. La razón para la derrama de los techos era por problema de filtraciones.

191. Con anterioridad al huracán María, la última vez que pintaron el Complejo fue para el año 2002.

192. La derrama para sellado de techos y pintura ascendía a $230,000.00. Dicha derrama fue acordada mediante asamblea para el año 2015. No obstante, los trabajos se realizaron luego del huracán María. Los trabajos de pintura de todos los edificios y áreas comunes del condominio, así como el sellado de techo se iniciaron y llevaron a cabo en el 2018.

193. No hubo quejas o reclamaciones por parte del Consejo luego que los trabajos de pintura y techo fueron culminados. El trabajo de los techos fue realizado en los edificios 23,24 y 25.

194. En el año 2020 se realizaron trabajo de remoción y remplazo del material de Danosa en los techos de los edificios 7 y 9 para atender problemas de filtraciones.

195. Por ende, los techos de los edificios no podían estar todos planos y lisos como indicó el Sr. Jimenez, ya que varios de estos tenían problemas de filtración antes del paso del Huracán María. Tampoco todos los edificios podían mostrar las mismas condiciones y

daños cuando FBS y Entech realizaron la inspección, ya que se habían realizado reparaciones en los techos durante el año 2018 y en algún momento en el año 2020.

196. El Sr. Jimenez reconoció que el Consejo quedó satisfech[o] y sin queja por los trabajos de pintura, reparación y sellado de techo que se llevaron a cabo durante el año 2018, y que los mismos se hicieron conforme a lo establecido en la Asamblea llevada a cabo en enero de 2015 y pagada con la derrama determinada para esos fines, previo al paso del Huracán María.

197. La parte demandante no presentó evidencia de cuánto pago por el trabajo de remoción y remplazo del material de Danosa en los techos de los edificios 7 y 9 del complejo. Según el testimonio del Sr. Jimenez la reparación de estos techos consistió en remover y colocar un sistema nuevo de Danosa para corregir las filtraciones.

198. Según el testimonio del Ing. William Rosario Charriez, a quien este Tribunal le mereció creíble, el producto de Danosa puede ser reparado parcialmente en las áreas afectadas del techo.

199. El estimado de ROV considera partidas para reparaciones de daños en áreas específicas en los techos.

200. No es necesario remplazar en su totalidad el sistema de impermeabilización existente, ni removerlo hasta el piso de hormigón como sugiere el informe de FBS y Entech. Tampoco es requisito cumplir con el Puerto Rico Building Code de 2018, ya que el alcance del trabajo es uno de reparación.

201. El estimado de daños preparado por ROV, contenido en el informe pericial suscrito por el Ing. Rosario Chárriez, asciende a $591,999.82. Dicho estimado de daños no está ajustado.

202. Para la fecha del primer ajuste de la reclamación, el Consejo no había presentado ningún estimado de daños a la aseguradora.

203. El Sr. Andrew Josehp Fusco es el presidente o CEO de la corporación The Fusco Group Partners, Inc. compañía de ajustadores públicos que hace negocios como "WorldClaim". Las oficinas principales están localizadas en New York. WorldClaim es una marca registrada en el estado de Delaware.

204. El Sr. Andrew Josehp Fusco es ajustador público con licencia desde el 1983 y tiene licencia de ajustador en Puerto Rico.

205. El Sr. Fusco ha trabajado como ajustador en más de 65 eventos naturales alrededor del mundo.

206. The Fusco Group Partners, Inc., (WorldClaim) atiende reclamaciones comerciales, residenciales, industrials, entre otras

207. Entre las obligaciones del Sr. Fusco está la de ayudar al asegurado a documentar, preparar, someter y negociar una reclamación con la aseguradora a base de la póliza.

208. WorldClaim brindó servicios de ajustador público al Consejo, y los honorarios pactados con el Consejo son contingentes. El Sr. Fusco no recordó el por ciento que pactó con el Consejo, pero le sonó razonable y de uso y costumbre que Fusco Group Partner, cobra aproximadamente el 10% de la cantidad que pague la aseguradora.

209. Worldclaim fue contratada por el Consejo de Titulares del Complejo Monte Real luego de la primera oferta de ajuste realizada por Mapfre. WorldClaim tiene

un interés económico en el resultado de la reclamación del Consejo a MAPFRE, pues mientras más dinero reciba el Consejo, más serán sus honorarios.

210. El Sr. Fusco no recordó tampoco sí WorldClaim cobró el porciento pactado de la suma de $229,085.51 que MAPFRE le pagó al Consejo durante el litigio.

211. WorldClaim contrató un ajustador internacional, el Sr. Filiberto Fernández, también conocido por "Fil Fernández", para asistirle en el proceso de reclamación de Monte Real ante MAPFRE. También contrató un arquitecto internacional y tres arquitectos locales en adiestramiento.

212. WorldClaim comenzó los trabajos de inspección en el Complejo para septiembre de 2018 y culminó para noviembre de 2018.

213. WorldClaim coordinó una inspección conjunta con los inspectores de Mapfre.

214. Las inspecciones realizadas por el equipo de WorldClaim se llevaron a cabo entre los meses de septiembre a noviembre de 2018.

215. Durante las inspecciones, WorldClaim inspección 88 apartamentos de un total de 122, para un 72.13%. No todas las unidades estaban disponibles para inspección.

216. Worldclaim le notificó a Mapfre su informe con la reclamación del Consejo en abril de 2019 por $3,459,330.89 (RCV). Dicho estimado de costos no estaba ajustado.

217. La parte demandante no presentó el informe de ajuste preparado por Worldclaim.

218. Luego de la entrega del informe de Worldclaim, se coordinaron inspecciones conjuntas entre el personal de WorldClaim y los consultores de Mapfre.

219. Las inspecciones conjuntas se llevaron a cabo en los meses de mayo y junio de 2019.

220. La compañía ECM fue contratada por Mapfre para que fungiera como ajustador independiente. Luego se designó a ROV para realizar la investigación de la reclamación.

221. RD Management fue subcontratada por ROV para investigar la reclamación e inspeccionar la Propiedad.

222. Luego de las inspecciones conjuntas, Mapfre emitió el segundo ajuste de la reclamación por $229,085.51.

223. El Sr. Fusco no recordó haber visto algún documento sobre la reclamación inicial del Consejo.

224. El Sr. Fusco vio la segunda oferta de MAPFRE cuando se recibió, pero no estuvo de acuerdo, y como entendía que se estaba acabando el tiempo, y se estaba acercando el término prescriptivo y no podían ajustar la reclamación, recomendó al Consejo que contratara representación legal.

225. El Consejo no respondió la oferta de MAPFRE.

226. El Sr. Omar Acevedo Avilés, ocupando en aquel momento el puesto de ajustador senior en el Departamento de Propiedad de MAPFRE, le volvió a remitir al Consejo por correo electrónico la segunda oferta de pago con el detalle de los daños reconocidos, y el resumen de los límites y deducibles de la póliza.

227. El correo electrónico remitido por el Sr. Omar Acevedo al Sr. Fil Fernández y a la Sra. Jeliza Emill Díaz Pérez (representante de WorldClaim) dice "Saludos adjunto desglose y oferta final para la reclamación en referencia, favor notificarnos si están de acuerdo para proceder a emitir la prueba de pérdida, de lo contrario informar a nuestros ingenieros si entienden existe

alguna diferencia a reevaluar.

228. El 27 de septiembre de 2019, el Sr. Omar Acevedo le notificó el estimado de daños y ajuste de la reclamación, y la oferta de MAPFRE a la Lcda. Ruth Rodríguez Rivera, abogada del Consejo.

229. Mapfre realizó tres ajustes de la reclamación del Consejo de Titulares de Monte Real. El primer ajuste fue realizado el 16 de mayo de 2018 por la cantidad de $43,429.99; el segundo con fecha del 26 de septiembre de 2019 por $229,085.51 y el tercer ajuste por la cantidad de $230,718.11.

230. Entre el tercer ajuste hubo una reducción de partidas que totalizan la suma de $81,668.65 de partidas concedidas en el segundo ajuste.

231. El ajustador Omar Acevedo Avilés desconoce las razones por las cuales Mapfre redujo o eliminó ciertas partidas en el tercer ajuste.

232. El segundo ajuste de Mapfre fue preparado por el personal de ECM luego de que personal de ECM y Worldclaim, realizaran una inspección conjunta.

233. El ajustador Omar Acevedo Avilés solamente preparó el tercer ajuste. Dicho ajuste fue preparado con el Informe pericial de ROV, la póliza y el contrato de pintura enviado posteriormente por el Consejo.

234. El Sr. Omar Acevedo está familiarizado con el segundo ajuste de MAPFRE, porque lo revisó para emitir la oferta al Consejo para el 19 de septiembre de 2019, mediante correo electrónico.

235. El Sr. Omar Acevedo tiene un bachillerato en Ingeniería Civil de la Universidad de Puerto Rico, Recinto de Mayaguez del año 2010, y tiene licencia de ingeniero en entrenamiento desde el 2012 y licencia de ajustador independiente II desde el 2014. Ambas licencias están activas.

236. El Sr. Omar Acevedo trabajo como ajustador de Mapfre en la División de Reclamaciones Propiedad desde el 2014.

237. Como ajustador en MAPFRE, atiende reclamaciones de propiedad. Estudia e investiga las reclamaciones con la evidencia presentada por el asegurado y la investigación de campo. Luego emite opinión sobre la procedencia de la reclamación y el pago que corresponde, si alguno.

238. Todo documento que se genera como parte de una reclamación como acuses de recibo, carpetilla, aviso de accidente, fotos, estimados, facturas, correos electrónicos, y otros, se guardan en un expediente o archivo digital en una plataforma digital propietaria de MAPFRE llamada "WISE", bajo un número de reclamación.

239. WISE es un archivo digital en el que se almacena en un servidor en la red a través de un proveedor de computación en la nube.

240. Todos los documentos que tienen que ver con la reclamación se suben a WISE para tener acceso en cualquier parte del mundo. Es un requisito de la Oficina del Comisionado de Seguros.

241. Los ajustadores y personas autorizadas por MAPFRE custodian el expediente de reclamación.

242. El Sr. Acevedo declaró que luego del paso del Huracán María todos los ajustadores internos trabajaban con el público en las oficinas centrales. Indicó que había filas desde horas en la madrugada y se atendía por el personal.

243. Para efectuar el ajuste del Informe Pericial, el Sr. Omar Acevedo solo revisó el informe pericial de ROV

Engineering Services, PSC, el contrato de pintura que había suscrito el Consejo previo al paso del Huracán María, el estimado de costos de ROV y la póliza.

244. Para efectuar el ajuste, el Sr. Omar Acevedo descansó en el informe pericial de ROV, porque ese informe analizó y consideró el informe que rindió FBS y Entech.

245. El tercer ajuste se le notificó a la parte demandante para el 24 de abril de 2023.

246. El Sr. Omar Acevedo verificó los daños que se reflejan en el informe pericial y la causa del daño para identificar si está cubierto por la póliza o aplica una exclusión.

247. Conforme los términos y condiciones de la póliza, para que se cubra los daños por agua en el interior de la propiedad, tiene que haber habido una apertura o rotura exterior ocasionada por el viento. El daño ocasionado por el agua que se filtra por una ventana o por debajo de las puertas no está cubierto por la póliza.

248. Surge del ajuste realizado por el Sr. Omar Acevedo que se eliminaron las partidas relacionadas a las condiciones generales conforme la exclusión de la póliza que surge de la forma CP 04 05-10 12, "Cost of Construction by an Ordinance or Law".

249. Se descontó las partidas de condiciones generales, ya que solo proceden a manera de [r]embolso en caso de que el asegurado en efecto incurra en estos gastos inciertos. Es decir, dicha partida solo se indemniza si el asegurado evidencia que incurrió en dicho gasto.

250. Asimismo, surge del estimado ajustado que se eliminó la partida para el pago del "business to business" ya que la Asociación esta excepta de dicho pago conforme el Código de Rentas Internas de Puerto Rico.

251. El Sr. Omar Acevedo eliminó del estimado las cuantías otorgadas por daños a lozas de cerámicas por ser considerado un vicio de construcción, provocado por las fallas en la preparación de la base donde se instalan y/o mal manejo de pegamento utilizados. Esto, a pesar de que los inspectores de ROV determinaron daños en loza atribuibles al huracán.

252. El Sr. Omar Acevedo también eliminó las partidas asociadas a los trabajos de pintura del exterior ya que el Consejo había contratado los trabajos de pintura para el exterior de los edificios con antelación al paso del Huracán María y dichos trabajos fueron realizados para el 2018.

253. El Sr. Acevedo aplicó las condiciones, limitaciones y exclusiones de la póliza, así como sus deducibles. Luego de los ajustes realizados por el Sr. Acevedo al estimado de costos de ROV, el total neto a pagar por MAPFRE resultó en la suma de $230,718.11.

254. La Póliza dispone en el documento titulado *Condominium Assocation Coverage Form*, Inciso A (4)(3) lo siguiente:

"e. Increased Cost of Construction

(1)        This Additional Coverage applies only to buildings to which the Replacement Cost Optional Coverage applies.

(2)        In the event of damage by a Covered Cause of Loss to a building that is Covered Property, we will pay the increased costs incurred to comply with the minimum standards of an ordinance or law in the course of repair, rebuilding or replacement of damaged parts of that property, subject to the limitations stated in the e. (3) through e. (9) of this Additional

Coverage.

(3)     The ordinance or law referred to in e. (2) of this Additional Coverage is an ordinance or law that regulates the construction or repair of buildings or establishes zoning or land use requirements at the described premises and is in force at the time of loss.

(4)     Under this Additional Coverage, we will not pay any costs due to an ordinance or law that:

(a)     You were required to comply with before the loss, even when the building was undamaged; and

(b) You failed to comply with.

(5) Under this Additional Coverage, we will not pay for:

The enforcement of or compliance with any ordinance or law which requires demolition, repair, replacement, reconstruction, remodeling or remediation of property due to contamination by "pollutants" or due to the presence, growth, proliferation, spread or any activity of "fungus", wet or dry rot or bacteria; or

(a)     Any costs associated with the enforcement of or compliance with an ordinance or law which requires any insured or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of "pollutants", "fungus", wet or dry rot or bacteria.

(6)     The most we will pay under this Additional Coverage for each described building insured under this Coverage Form, is $10,000 or 5% of the Limit of Insurance applicable to that building, whichever is less. If a damaged building is covered under a blanket Limit of Insurance which applies to more than one building or item of property, then the most we will pay under this Additional Coverage, for that damaged building, is the lesser of $10,000 or 5% times the value of the damaged building as of the time of loss times the applicable Coinsurance percentage.

The amount payable under this Additional Coverage is additional insurance.

**(7) With respect to this Additional Coverage:**

**(a) We will not pay for the Increased Cost of Construction:**

**(i)     Until the property is actually repaired or replaced at the same or another premises; and**

**(ii)     Unless the repair or replacement is made as soon as reasonably possible after the loss or damage, not to exceed two years. We may extend this period in writing during the two years.**

(b)     If the building is repaired or replaced at the same premises, or if you elect to rebuild at another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of e. (6) of this Additional Coverage, is the increased cost of construction at the same premises.

(c)     If the ordinance or law requires relocation to another premises, the most we will pay for the Increased Cost of Construction, subject to the provisions of e. (6) of this

Additional Coverage, is the increased cost of construction at the new premises.

(8) This Additional Coverage is not subject to the terms of the Ordinance or Law Exclusion to the extent that such Exclusion would conflict with the provisions of this Additional Coverage.

(9) The costs addressed in the Loss Payment and Valuation Conditions and the Replacement Cost Optional Coverage, in this Coverage Form, do not include the increased cost attributable to enforcement of or compliance with an ordinance or law. The amount payable under this Additional Coverage, as stated in e. (6) of this Additional Coverage, is not subject to such limitation."

255. La Sección E (3) Duties in the Evento f Loss Or Damage establece las obligaciones del asegurado al momento de la pérdida o el daño a la propiedad asegurada. Entre las obligaciones del asegurado se encuentran:

[…]

(2) Give us prrompt notice of the loss or damage. Include a description of the property involved.

[…]

(7) Send us a signed, sworn proof of loss containing the information we request to investigate the claim. You must do this within 60 days after our request. We will supply you with the necessary forms.

(8) Cooperate with us in the investigation or settlement of the claim.

256. La Sección E (4) sobre *Loss Payment* dispone:

a. In the event of loss or damage covered by this Coverage For, at our option, we will either:

(1) Pay the value of lost or damaged property;

(2) Pay the cort of repairing or replacing the lost or damaged property, subject to b. below;

(3) Take all or any part of the property at an agreed or appraised value; or

(4) Repair, rebuild or replace the property with other property of like kind and quality, subject to b. below

We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

b. The cost to repair, rebuild or replace does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property.

c. […]

d. […]

e. […]

f. […]

g. We will pay for covered loss or damage to Covered Property within 30 days after we receive the sworm proof of loss, if you have complied with all of the terms of this Coverage Part, and:

(1) We have reached agreement with you on the amount of loss; or

(2) […]

257. El inciso E (8) de la Póliza dispone sobre *Valuation* lo siguiente: "We Will determine the value of Covered Property in the event of loss or damage as follows:

a. At actual cash value as of the time of loss or damage, except as provided in b. and c. below.

b. If the limit of Insurance for Building satisfies the Additional Condition, Coinsurance, and the cost to repair or replace the damage building property is $2,500 or less, we will pay the cost of building repairs or replacement.

The cost of building repairs or replacement does not include the increased cost attributable to enforcement of or compliance with any ordinance or law regulating the construction, use or repair of any property. However, the following property will be valued at the actual cash value, even when attached to the building:

(1) Awnings or floor coverings;

(2) Appliance for refrigerating, ventilating, coking, dishwashing or laundering; or

(3) Outdoor equipment or furniture.

c. Glass at the cost of replacement with safety-glazing material if required by law.

258. La Póliza en la sección G. *Optional Coverages*, inciso 3a dispone sobre *Replacement Cost* que "Replacement Cost (without deduction for depreciation) replaces Actual Cash Value in the Loss Condition, Valuation, of this Coverage Form".

259. La Póliza dispone en el formulario titulado *Causes of Loss-Special Form*, las exclusiones. En inciso B titulado *Exclusions* dispone:

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

a. Ordinance Or Law

The enforcement of or compliance with any ordinance or law:

(1) Regulating the construction, use or repair of any property; or

(2) Requiring the tearing down of any property, including the cost of removing its debris.

This exclusion, Ordinance Or Law, applies whether the loss results from:

(a) An ordinance or law that is enforced even if the property has not been damaged; or

(b) The increased costs incurred to comply with an ordinance or law in the course of construction, repair, renovation, remodeling or demolition of property, or removal of its debris, following a physical loss to that property."

En síntesis, el TPI mantuvo el mismo razonamiento de la Sentencia Enmendada al valorar los daños del Consejo en $1,005,757.49. Luego de aplicar los deducibles de la póliza y descontar el pago previamente realizado por MAPFRE, le ordenó pagarle al Consejo la cantidad neta ajustada de de $504,851.98. No

obstante, le concedió al Consejo la suma de $20,000 por honorarios de abogados bajo el Artículo 27.165 del Código de Seguros, *supra*.[35]

Posteriormente, el 6 de diciembre de 2024, MAPFRE presentó un *Memorando de Costas y Solicitud de Remedios a tenor a la Regla 35.1 de Procedimiento Civil*.[36]

Asimismo, el 12 de diciembre de 2024, MAPFRE presentó una *Moción de Reconsideración de la Segunda Sentencia Enmendada,* mediante la cual solicitó que el TPI reconsiderara y declarara No Ha Lugar la Demanda Enmendada. Además, requirió que se determinara que no procedían los honorarios de abogados al amparo del Artículo 27.165 del Código de Seguros de Puerto Rico, *supra*, y que en, consecuencia, se eliminara la concesión de honorarios otorgados a favor del Consejo por la suma de $20,000.[37]

El 16 de diciembre de 2024, la parte apelante radicó la *Oposición e Impugnación a "Memorando de Costas y Solicitud de Remedios a tenor con la Regla 35.1 De Procedimiento Civil.*[38]

El 19 de diciembre de 2024, el TPI dictó una *Resolución* mediante la cual concedió las costas y honorarios, a favor de la parte apelante, al amparo de la Regla 44.1 de Procedimiento Civil, por la suma de $9,487.27. Dicho monto sería descontado de la suma de $15,365.74 concedida a favor de MAPFRE conforme a la Regla 35.1 de Procedimiento Civil, *supra*, R.35.1.[39]

El 27 de enero de 2025, el Consejo presentó su Oposición a la Moción de Reconsideración de la Segunda Sentencia Enmendada. [40]Consecuentemente, el 5 de febrero de 2025, el TPI emitió una *Resolución* mediante la cual declaró Ha Lugar parcialmente la solicitud de reconsideración,

---

[35] Véase, Entrada Núm.379 en SUMAC-TPI.
[36] Véase, Entrada Núm.382 en SUMAC-TPI.
[37] Véase, Entrada Núm.383 en SUMAC-TPI.
[38] Véase, Entrada Núm.388 en SUMAC-TPI.
[39] Véase, Entrada Núm.392 en SUMAC-TPI.
[40] Véase, Entrada Núm.400 en SUMAC-TPI.

dejando sin efecto, únicamente, la concesión de honorarios de abogados al amparo del Artículo 27.165 del Código de Seguros, *supra*.[41]

Inconforme, el 7 de marzo de 2025, la parte apelante recurrió ante este Tribunal mediante un recurso de *Apelación.* Mediante el recurso, le imputó al TPI la comisión de los siguientes errores:

> El TPI erró como cuestión de derecho en sus determinaciones y conclusiones en torno a la prueba pericial y valorización de daños.
>
> En la alternativa, erró el TPI al no conceder ciertas cuantías evidenciadas en el juicio. Las cuales son independientes a los otros señalamientos de error.
>
> Erró el TPI al no conceder costas y honorarios de abogados bajo la Regla 34.4 de Procedimiento Civil.
>
> Erró el TPI al no conceder costas y honorarios de abogados bajo la Regla 35.1 de Procedimiento Civil.
>
> Erró el TPI al no conceder costas y honorarios de abogados bajo el Artículo 27.165 del Código de Seguros.

En síntesis, la parte apelante sostiene que la *Segunda Sentencia Enmendada* dictada por el TPI no solo contiene errores sustanciales en sus determinaciones de hechos como en las conclusiones de derecho, sino que también la indemnización concedida no fue justa, razonable ni conforme a derecho. Además, alega, que el TPI erró en la apreciación de la prueba presentada por el Consejo, la cual, conforme al estándar de la Regla 702 de Evidencia*, supra,* se basó en metodologías aceptadas y fue realizada por expertos con la debida experiencia y especialización; por lo que dicha prueba es más robusta y probatoria que la presentada por MAPFRE. En cuanto a la valorización de daños, sostiene que la Sentencia no ajustó las cuantías a la prueba presentada ni conforme a derecho. Asimismo, señala que las cuantías

---

[41] Véase, Entrada Núm.401 en SUMAC-TPI.

concedidas no se ajustan a los términos de la póliza, la cual establece el valor de reemplazo como base de la indemnización, y no así por el valor actual. Además, sostiene que ambos peritos de las partes reconocieron el aumento de los precios de la mano de obra y materiales en la actualidad, solicita así que se le otorgo un incremento, al menos de aproximadamente 20% en la cuantía reclamada. En esa misma línea, sostienen que deben incluirse las cuantías sobre arbitrios de construcción municipal, el impuesto de B2B, y la necesidad de un inspector de obras, todo lo anterior como elementos esenciales para la restauración del Condominio.

Por otra parte, sostiene que corresponde concederse costas y honorarios a su favor, al amparo de la Regla 34.4 de Procedimiento Civil, *supra*, por el incumplimiento de MAPFRE de conformidad a la Regla 33(a) de Procedimiento Civil, *supra*, por negarse a autenticar fotos. De igual modo, sostienen que debe ser revocada parcialmente la *Resolución* del TPI en cuanto a la concesión de las costas u honorarios de abogados a favor de la parte apelada conforme a la Regla 35.1 de Procedimiento Civil, *supra*, dado que MAPFRE incumplió con los requisitos de dichas reglas, y no alegó ni demostró temeridad. Además, sostiene que MAPFRE incurrió en incumplimiento negligente bajo la póliza y conforme al Código de Seguros de Puerto Rico, *supra*, debido a su inacción prolongada, ofertas iniciales irrisorias y practicas dilatorias, conducta que contraviene el deber de la buene fe que rige las relaciones de las aseguradoras con sus asegurados. Finalmente, sostiene que debe revocarse la *Resolución* del TPI que eliminó la cuantía concedida al Consejo al amparo del Artículo 27.165 del Código de Seguros, *supra*, y que dicha cuantía debe ser reinstalada.

El 15 de agosto de 2025, el Consejo presentó su *Alegato Suplementario,* en la que reiteró sus argumentos conforme a la TPO.

El 7 de octubre de 2025, la parte apelada presentó su *Alegato en oposición.* En el mismo sostiene que el TPI no cometió los señalamientos de error. En consecuencia, solicita que se confirme la Segunda Sentencia Enmendada, así como las costas u honorarios de abogados a favor de MAPFRE conforme a la Regla 35.1 de Procedimiento Civil, *supra,* R.35.1.

**III.**

**A.**

La glosa jurisprudencial ha resuelto que, los foros superiores no intervendrán con las determinaciones de hechos ni las adjudicaciones de credibilidad realizadas por el TPI, al menos que haya incurrido en error manifiesto, pasión, prejuicio o parcialidad. ***Rivera Menéndez v. Action Service***, 185 DPR 431, 444 (2012); ***Rivera Figueroa v. Autoridad de Acueductos y Alcantarillados de Puerto Rico***, 177 DPR 345, 356 (2009). De hecho, son pocos los casos en donde se ha concluido que el foro de instancia incurrió en pasión, prejuicio, parcialidad o error manifiesto. ***Dávila Nieves v. Meléndez Marín***, 187 DPR 750, 771 (2013).

Esta norma de deferencia judicial se apoya en que la tarea de apreciación de la prueba testifical está llena de elementos subjetivos y es el TPI quien está en mejor posición para aquilatarla. ***Sucn. Rosado v. Acevedo Marrero***, 196 DPR 884, 917 (2016); véase también, ***Dávila Nieves v. Meléndez Marín***, supra, pág. 771. Cónsono con ello, cuando "[l]a evidencia directa de una persona testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que otra cosa se disponga por ley". Regla 110 (D) de Evidencia, 32 LPRA VI, R. 110; ***Rivera Menéndez v. Action Service***, supra, pág. 444; ***Rivera Figueroa v. Autoridad de Acueductos y Alcantarillados de Puerto Rico***, supra, pág. 357. Por su parte, los

foros apelativos solo cuentan con "récords mudos e inexpresivos". *Rivera Torres v. Díaz López*, 207 DPR 636, 658 (2021).

Conforme a la Regla 42.2 de Procedimiento Civil, *supra*, R. 42.2, "[l]as determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos". La intervención de un foro apelativo con la evaluación de la prueba testifical procede "'en casos en que un análisis integral de dicha prueba cause en nuestro ánimo una insatisfacción o intranquilidad de conciencia tal que estremezca nuestro sentido básico de justicia'". *Rivera Figueroa v. Autoridad de Acueductos y Alcantarillas de Puerto Rico*, supra, pág. 356 (*citando Pueblo v. Cabán Torres*, 117 DPR 645, 648 (1986)). Por lo tanto, la parte apelante que cuestione una determinación de hechos realizada por el foro primario debe fundamentar la existencia de pasión, prejuicio o parcialidad, o error manifiesto. *Rivera Figueroa v. Autoridad de Acueductos y Alcantarillas de Puerto Rico*, supra, pág. 356; *Flores v. Soc. de Gananciales*, 146 DPR 45, 50 (1998).

Ahora bien, a pesar de la deferencia judicial, cuando las conclusiones de hecho del TPI están basadas en prueba pericial o documental, el tribunal revisor se encuentra en la misma posición que el foro recurrido. *González Hernández v. González Hernández*, 181 DPR 746, 777 (2011). Ante tales circunstancias, el Tribunal Apelativo tendrá facultad para adoptar su propio criterio con relación a la apreciación y evaluación de la prueba pericial, e incluso para descartarla, aunque resulte técnicamente correcta. *Íd.*; *Municipio de Loíza v. Sucns. De Suárez et al.*, 154 DPR 333, 363 (2001).

**B.**

Un perito es aquel que, gracias a educación o experiencia, posee un conocimiento o una destreza sobre una materia de tal manera que puede formar una opinión que, a su vez, sirve de ayuda al juzgador. *SLG Font Bardón v. Mini-Warehouse*, 179 DPR 322, 338 (2010), traduciendo a Black´s Law Dictionary, 8th ed., Minn., Thomson West, 2004, pág. 619. Véase, además, la Regla 703 de Evidencia, *supra*, R. 703. Al perito se le entiende como una persona competente e idónea debido a que tiene ciertas aptitudes, conocimiento y adecuada capacidad. *SLG Font Bardón v. Mini-Warehouse,* supra, pág. 338, citando a *San Lorenzo Trad., Inc. v. Hernández,* 114 DPR 704, 709 (1983). De ahí que la función del perito en un litigio es auxiliar al tribunal. *Pueblo v. Soto González*, 149 DPR 30, 41-42 (1999) (Sentencia). Véase, además, la Regla 702 de Evidencia, supra, R. 702.

Como norma general, la Regla 701 de Evidencia de Puerto Rico, supra, R. 701, establece que cuando una persona que no esté testificando como perito, su declaración en forma de opinión o inferencia será limitada a:

> (a) estén racionalmente fundadas en la percepción de la persona testigo,
> (b) sean de ayuda para una mejor comprensión de su declaración o para la determinación de un hecho en controversia,
> (c) y no, estén basadas en conocimiento científico, técnico o cualquier otro conocimiento especializado dentro del ámbito de la Regla 702.

A esos efectos, la Regla 702 de Evidencia, *supra*, permite que una persona testigo, capacitada como perito, pueda testificar en forma de opiniones o de otra manera cuando conocimiento científico, técnico o especializado sería de ayuda para que el tribunal entienda la prueba o determine un hecho en controversia.

Por su parte, la Regla 703 de Evidencia, *supra*, dispone lo relativo a la cualificación de una persona como testigo perito, y establece lo siguiente:

(A) Toda persona está calificada para declarar como testigo pericial si posee especial conocimiento, destreza, experiencia, adiestramiento o instrucción suficiente para calificarla como experta o perita en el asunto sobre el cual habrá de prestar testimonio. Si hubiere objeción de parte, dicho especial conocimiento, destreza, adiestramiento o instrucción deberá ser probado antes de que la persona testigo pueda declarar como perita.
(B) El especial conocimiento, destreza, experiencia, adiestramiento o instrucción de una persona que es testigo pericial podrá ser probado por cualquier evidencia admisible, incluyendo su propio testimonio.
(C) La estipulación sobre la calificación de una persona perita no es impedimento para que las partes puedan presentar prueba sobre el valor probatorio del testimonio pericial.

El valor probatorio que puede atribuirse al testimonio pericial está regulado en la Regla 702 de Evidencia, *supra*, y dependerá, establece, entre otros factores, de: 1) si el testimonio se basa en hechos o información suficiente; (2) si el testimonio es el producto de principios y métodos confiables; (3) si la persona testigo aplicó principios y métodos de manera confiable a los hechos del caso; (4) si el principio en que se basa el testimonio ha sido aceptado generalmente en la comunidad científica; (5) las credenciales de la persona testigo; y (6) la parcialidad de la persona testigo.

La admisibilidad del testimonio vertido por la persona perita será determinada por el tribunal de conformidad con los factores enumerados en la Regla 403 de Evidencia, *supra*, es decir:

Evidencia pertinente puede ser excluida cuando su valor probatorio queda sustancialmente superado por cualesquiera de estos factores:
(a) Riesgo de causar perjuicio indebido.
(b) Riesgo de causar confusión.
(c) Riesgo de causar desorientación del jurado.
(d) Dilación indebida de los procedimientos.
(e) Innecesaria presentación de prueba acumulativa.

El juzgador o juzgadora de los hechos tiene amplia discreción en relación con la aceptación o exclusión de la prueba pericial presentada. ***S.L.G. Font Bardón v. Mini-Warehouse***, 179 DPR 322, 343 (2010). Incluso, en nuestro ordenamiento jurídico es norma

reiterada que el juzgador o juzgadora de los hechos no está obligado a aceptar las conclusiones hechas por un perito, por lo que, si luego de evaluar el testimonio pericial llega a la conclusión de que no merece credibilidad puede rechazarlo. Íd. pág. 346 citando a ***Pueblo v. Montes Vega***, 118 DPR 164, 170-171 (1986), citando a ***Pueblo v. Marcano Pérez***, 116 DPR 917, 928 (1986); ***Velázquez v. Ponce Asphalt,*** 113 DPR 39, 48 (1982); ***Pueblo v. Dones***, 56 DPR 211, 222 (1940).

Sobre la cualificación de la persona perita bajo la Regla 703 de Evidencia, *supra*, el tratadista el tratadista Rolando Emmanuelli Jiménez ha expresado que:

> No es necesario cualificar a la persona como perita antes de recibir su testimonio. La Regla establece que el conocimiento, destreza o experiencia que cualifica al perito deberá ser probado antes de que declare, sólo si existe objeción de parte. Para establecer las credenciales del o la perita se puede presentar cualquier tipo de evidencia incluyendo el testimonio del propio perito. Lo más común es que el o la perita sea interrogada sobre sus cualificaciones antes de que comience a declarar, pero la Regla permite que se entre en la materia o sustancia del testimonio sin determinarse primero las cualificaciones. Esta norma persigue la economía procesal y la rapidez en la presentación de la prueba. Solamente habrá que entrar en ese extremo si la parte contraria objeta las cualificaciones del o la perita. R. Emmanuelli Jiménez, *Prontuario de Derecho Probatorio Puertorriqueño*, 4ta ed. rev., Ed. Situm, 2015, pág. 439.

Existen ocasiones en las cuales una persona perita a su vez es testigo, el Tribunal Supremo ha expresado que esta condición se configura cuando:

> ...concurren las circunstancias fortuitas de un perito que presencia o participa en un hecho que subsiguientemente es total o parcialmente objeto de una contienda judicial. Nos 'hallamos [ante] una doble actividad probatoria de una misma persona: actividad testifical y actividad pericial. Una misma persona actúa como testigo y perito, a través del procedimiento de la prueba de testigos. ***San Lorenzo Trad., Inc. v. Hernández,*** 114 DPR 704, 713 (1983) (citas omitidas).

A raíz de lo anterior nuestro más alto foro ha reconocido tres (3) tipos de peritos, estos son: (1) perito de ocurrencia, (2) perito en general y (3) peritos intermedios. ***San Lorenzo Trad., Inc. v. Hernández,*** supra, en la pág. 718. Referente a los peritos de

ocurrencia, estos son aquellos que han tenido una percepción inmediata de los hechos lo cual es considerada información irremplazable. Es decir, estos peritos han adquirido información de manera extrajudicial mediante observaciones directas o participaciones subsiguientes que son de pertinencia en el litigio. *Íd.*

**C.**

Las obligaciones nacen de la ley, los contratos, los cuasicontratos, los actos y omisiones ilícitos o en los que se actúe mediando culpa o negligencia. Artículo 1042 del Código Civil de 1930, 31 LPRA ant. sec. 2992, vigente cuando ocurrieron los hechos. El Artículo 1206 del Código Civil de 1930, 31 LPRA ant. sec. 3371, establece que un contrato existe desde que una o varias personas prestan su consentimiento para obligarse entre ellas a prestar un servicio o brindar una cosa. Aquellas obligaciones que nacen a raíz de un contrato se consideran ley entre las partes, por lo que deben cumplirse a tenor de este. Artículo 1044 del Código Civil de 1930, 31 LPRA ant. sec. 2994. Los contratos quedan perfeccionados desde el mero consentimiento "y desde entonces obligan, no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley". Artículo 1210 del Código Civil de 1930, 31 LPRA ant. sec. 3375.

Para que exista un contrato deben concurrir tres (3) elementos, estos son: (a) el consentimiento de los contratantes; (b) el objeto cierto que sea materia el contrato y (c) la causa de la obligación que se establezca. Artículo 1213 del Código Civil de 1930, 31 LPRA ant. sec. 3391. Por su parte, el consentimiento "se manifiesta por el concurso de la oferta y de la aceptación sobre la cosa y la causa que han de constituir el contrato". Artículo 1214 del Código Civil de 1930, 31 LPRA ant. sec. 3401. El consentimiento será nulo cuando es prestado mediante error, violencia,

intimidación o dolo. Artículo 1217 del Código Civil de 1930, 31 LPRA ant. sec. 3404. El dolo ocurre cuando mediante palabras o maquinaciones insidiosas de parte de uno de los contratantes, se induce a otro contratante a realizar un negocio jurídico que sin estas palabras o maquinaciones no se hubiese celebrado. Artículo 1221 del Código Civil de 1930, 31 LPRA ant. sec. 3409.

Quienes en el cumplimiento de sus obligaciones incurran en dolo, negligencia o morosidad quedaran sujetos a la indemnización de los daños y perjuicios causados por esta. Artículo 1054 del Código Civil de 1930, 31 LPRA ant. sec. 3018. Las acciones ex contractu están fundamentadas en el incumplimiento de un deber que surge de la voluntad previa pactada entre las partes, por lo que su finalidad es que se cumplan aquellas promesas por los cuales las partes prestaron su consentimiento. ***Muñiz-Oliviari v. Steifel Labs.,*** 174 DPR 813, 818 (2008) (citas omitidas). El Tribunal Supremo, mientras discute las diferencias entre las acciones extracontractuales y las *ex contractu* expresó lo siguiente:

> A pesar de esta diferenciación entre la acción de daños extracontractual y la ex contractu, ambas comparten sus elementos esenciales. Al igual que en la acción extracontractual, **en la ex contractu la parte promovente debe probar la existencia de los daños alegados y del incumplimiento culposo o doloso de la obligación contractual.** Además, debe existir una relación de causa a efecto entre el incumplimiento y los daños sobrevenidos. Íd. pág. 819. (Énfasis suplido).

### D.

En nuestro ordenamiento jurídico, los negocios de seguros están revestidos con el más alto interés público debido a su importancia, complejidad y su efecto tanto en la economía como en la sociedad. ***Consejo de Titulares v. MAPFRE***, 208 DPR 761, 773 (2022). Esta industria está regulada mediante la Ley Núm. 77 de 19 de junio de 1957, conocida como Código de Seguros de Puerto Rico, 26 LPRA se. 101, según enmendada. En el ámbito de las prácticas desleales en el ajuste de reclamaciones el Artículo 27.161 del Código

de Seguros de Puerto Rico, *supra,* prohíbe que ninguna persona puede incurrir o llevar a cabo las siguientes prácticas:

> [...]
> (2) Dejar de acusar recibo y no actuar con razonable diligencia dentro de los noventa (90) días, luego de radicada y notificada una
> reclamación bajo los términos de una póliza.
> (3) Dejar de adoptar e implementar métodos razonables para la rápida investigación de las reclamaciones que surjan bajo los términos de una póliza.
> (4) Rehusar pagar una reclamación sin llevar a cabo una investigación razonable basada en la información disponible.
> (5) Rehusar confirmar o denegar cubierta de una reclamación dentro de un término razonable luego de haberse completado la declaración de pérdida.
> (6) No intentar de buena fe de llevar a cabo un ajuste rápido, justo y equitativo de una reclamación de la cual surja claramente la responsabilidad.
> (7) Obligar a los asegurados o reclamantes a entablar pleitos para recobrar bajo los términos de una póliza, porque se le ha ofrecido al asegurado o reclamante una cantidad sustancialmente menor que la cantidad que podría ser recobrada finalmente en un litigio o porque se le ha negado incorrectamente la cubierta bajo los términos de la póliza.
> (8) Tratar de transigir una reclamación por una cantidad menor que la que el asegurado o reclamante razonablemente tenga derecho, basado en la literatura o material impreso que se le acompañó o se hizo formar parte de la solicitud.
> [...]

En Artículo 27.162 del Código de Seguros de Puerto Rico, *supra,* establece los términos que tienen los aseguradores para resolver las reclamaciones, en específico versa de la siguiente manera:

> (1) La investigación, ajuste y resolución de cualquier reclamación se hará en el período razonablemente más corto dentro de noventa (90) días después de haberse sometido al asegurador la reclamación.
> (2) En el caso de que un asegurador no pueda resolver una reclamación en el término
> establecido en el inciso (1) de este Artículo, deberá mantener en sus expedientes los documentos que acrediten la existencia de justa causa para exceder el término anteriormente dispuesto.
> (3) El Comisionado en cualquier momento podrá ordenar la resolución inmediata de cualquier reclamación si considera que se está dilatando o retrasando indebida e injustificadamente la resolución de la misma.

En el año 2012, la Oficina del Comisionado de Seguros emitió una Carta Normativa Núm. 2012- 145 D en la cual se expresa sobre lo que es considerado como justa causa a la luz del Artículo 27.162, *supra,* en específico expresó:

> [...]

(b) Reclamaciones altamente complejas- Siniestros catastróficos, pérdidas cuantiosas o numerosas, o reclamaciones donde sea necesaria la contratación de peritos especializados, y en los que cerrar la reclamación sería un perjuicio del asegurado o

reclamante. En estos casos, el expediente de la reclamación deberá documentarse periódicamente sobre el adelanto hacia la resolución de la misma, así como un estimado de tiempo necesario para resolver.

[...]

Conforme al Código de Seguros de Puerto Rico, una póliza o contrato de seguro es aquel "mediante el cual una persona se obliga a indemnizar a otra o a pagarle o a proveerle un beneficio específico o determinable al producirse un suceso incierto previsto en el mismo". 26 LPRA sec. 102. "Consecuentemente, su propósito es indemnizar y proteger al asegurado mediante el traslado del riesgo a la aseguradora si ocurre un evento específicamente pactado en el contrato". *Rivera Matos et al. v. Triple-S et al.,* 204 DPR 1010, 1020 (2020) (Citas y comillas omitidas). Conforme al mismo Código de Seguros, "en primera instancia las cláusulas de una póliza se interpretarán de manera global, examinando el conjunto total de las disposiciones, los términos y las condiciones vigentes a la fecha que se juzgue relevante". Íd. (Citas omitidas). Véase, además, *Negrón Castro y otros v. Soler Bernardini y otros,* 2025 TSPR 96, 216 DPR _____.

Recientemente, el Tribunal Supremo reiteró que "las exclusiones a diferencia de las condiciones limitan o excluyen el alcance de las cubiertas, y específicamente excluyen aquellos riesgos o peligros de la cubierta general que el asegurador así exprese en esta parte de la póliza". *Negrón Castro y otros v. Soler Bernardini y otros*, *supra*, en la pág. 13. (cita omitida).

Al evaluarse las protecciones brindadas por una póliza, es necesario además examinar sus exclusiones, que, por lo general, se interpretan restrictivamente en contra del asegurador bridando una mayor protección al asegurado. *Rivera Matos et al. v. Triple-S et al.*, supra, pág. 1021. No pese a lo anterior, el Tribunal Supremo ha

expresado que, si los términos de exclusión son claros y son de aplicación, la aseguradora no será responsable de aquellos riesgos expresamente exceptuados. Íd. citando a *Viruet et al. v. SLG Casiano- Reyes,* 194 DPR 271, 279 (2015). Respecto a los litigios de seguros, nuestro más alto foro ha expresado que corresponde al asegurado el peso de establecer que su reclamación está incluida dentro de las disposiciones del contrato de seguro. *Rivera Matos et al. v. Triple-S* et al., supra, pág. 1022. Por su parte, corresponde a la aseguradora evidenciar que aplica alguna exclusión. Íd.

Por otra parte, ante las múltiples violaciones por parte de las compañías aseguradoras a las disposiciones del Código de Seguros, la Asamblea Legislativa de Puerto Rico (Asamblea Legislativa) añadió los Artículos 27.164 y 27.165, Ley Núm. 77, supra, 26 LPRA sec. 2716d y sec. 2716e, al Código, mediante la promulgación de la Ley Núm. 247-2018, 26 LPRA sec. 2716d *et seq*. Esto, con el fin primordial de brindar herramientas y protecciones adicionales en beneficio de los asegurados para garantizar el fiel cumplimiento de los fines del Código de Seguros y, así, agilizar el proceso de recuperación de Puerto Rico ante el paso de los huracanes Irma y María, Exposición de Motivos de la Ley Núm. 247, *supra*. A su vez, la Asamblea Legislativa entendió que era indispensable establecer parámetros que garantizaran una respuesta apropiada y oportuna por parte de las aseguradoras, para beneficio de los asegurados. Íd.

Cónsono con los anteriores fines, ambos articulados proveen para la concesión de honorarios por parte de las aseguradoras. *Consejo Titulares del Condominio Playa II v. MAPFRE, 2024 TSPR 140, 215 DPR (2024).* Por su parte, el inciso cuatro (4) del Artículo 27.164 dispone que "[e]n caso de adjudicación adversa en el juicio o luego de una apelación, el asegurador autorizado será responsable de los daños, junto con costos judiciales y honorarios razonables de abogados incurridos por el demandante". Ley Núm.

77, *supra*, 26 LPRA sec. 2716d. Mientras que, el inciso uno (1) del Artículo 21.165 establece que:

> Al recaer una sentencia o decreto por cualquiera de los tribunales contra un asegurador y en favor de cualquier asegurado nombrado o el beneficiario designado bajo una póliza o contrato ejecutado por el asegurador, el Tribunal de Primera Instancia o, en el caso de una apelación en la que prevalezca el asegurado o beneficiario, el tribunal de apelación, deberá adjudicar o decretar contra el asegurador y a favor del asegurado o el abogado del beneficiario una suma razonable como honorarios o compensación por haber procesado la demanda en la que se obtuvo una recuperación. Íd., 26 LPRA sec. 2716e.

Ahora bien, el inciso tres (3) del Artículo 27.164, especifica que "[c]omo condición previa a entablar una acción bajo las disposiciones de este Artículo, la parte afectada deberá notificar por escrito al Comisionado de Seguros y a la aseguradora de la violación", Ley Núm. 77, *supra*, 26 LPRA sec. 2716d. Así, pues, la aseguradora tendrá un término de sesenta (60) días para remediar la violación. Íd. De manera que, "no procederá acción alguna si, dentro de los sesenta (60) días posteriores al recibo de la notificación, se pagan los daños o se corrigen las deficiencias o violaciones que fundamentan la notificación". Ley Núm. 77, *supra* 26 LPRA sec. 2716d. Entiéndase que, "ese término de sesenta días provee una última oportunidad para que la aseguradora responda extrajudicialmente y dentro de un término fijo". ***Con. Tit. 76 Kings Court v. MAPFRE,*** *208 DPR 1018, 1037 (2022).* En consecuencia, "si la aseguradora opta por no atender el reclamo dentro de esos sesenta días, por la razón que fuese, entonces podría enfrentar una demanda por daños y honorarios de abogado amparada en el Código de Seguros". Íd. Es menester apuntalar que nuestro Tribunal Supremo razonó que el aludido término es de naturaleza jurisdiccional, de modo que es ineludible e improrrogable. Íd., a la pág. 1036.

Por otra parte, es preciso acentuar que el Alto Foro, aclaró que la causa de acción de honorarios de abogado tanto bajo el Artículo

27.164, Ley Núm. 77, *supra,* 26 LPRA sec. 2716d., así como la del Artículo 27.165, Íd., 26 LPRA sec. 2716e, está disponible solo cuando la aseguradora no remedia la situación en el término de sesenta (60) días establecido en el Artículo 27.164. Íd., 26 LPRA sec. 2716d. Por ende "la acción civil instada antes de transcurrir el mencionado término despoja al tribunal de autoridad para atender la reclamación, ya que nunca se configuró la causa de acción". ***Consejo Titulares del Condominio Playa II v. MAPFRE****, supra.*

## E.

El anterior Art. 1802 del Código Civil de Puerto Rico de 1930, 31 LPRA ant. sec. 5141, establecía que, "el que por acción u omisión causa daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado. La imprudencia concurrente del perjudicado no exime de responsabilidad, pero conlleva la reducción de la indemnización". Para prosperar en una acción de daños se requiere que se lleve a cabo una actuación u omisión culposa o negligente; que se ocasiona un daño y que exista una relación causal entre la acción y omisión y el daño ocasionado. ***Hernández Vélez v. Televicentro***, 168 DPR 803, 831 (2006); ***Elba ABM v. UPR***, 125 DPR 294, 308 (1990); ***Hernández v. Fournier***, 80 DPR 93,96 (1957). En los casos en que el daño infligido es el resultado de una omisión se requiere: demostrar la existencia de un deber jurídico de actuar de parte del alegado causante del daño y el incumplimiento de éste con ese deber y si de haberse realizado el acto omitido se hubiera evitado el daño. ***Hernández Vélez v. Televicentro***, supra, pág. 830; Véase: ***Santiago v. Sup. Grande***, 166 DPR 796 (2006). Entre el acto culposo o negligente y el daño causado debe existir un nexo causal adecuado. ***Mena Pamias v. Jiménez Meléndez***, 212 DPR 758, 768 (2023).

Una vez se impone responsabilidad de conformidad con la normativa expuesta, el deber de resarcir al damnificado debe

otorgársele un valor económico. ***Mena Pamias v. Jiménez Meléndez***, supra. pág. 769; citando a: ***García Pagán v. Shiley Caribbean, etc.***, 122 DPR 193, 206 (1988). En cuanto a la valorización de daños, el Tribunal Supremo ha expresado que es "una tarea sumamente difícil, ardua y angustiosa, ya que no existen fórmulas científicas que provean un resultado exacto ara indicar como se justiprecia el dolor y el sufrimiento causado". ***Herrera, Rivera v. S.L.G. Ramírez-Vicéns***, 179 DPR 774, 791 (2010); ***Vázquez Figueroa v. E.L.A.***, 172 DPR 150, 154 (2007). El proceso de valorización de los daños, los tribunales sentenciadores deben examinar la prueba desfilada y evaluar "las indemnizaciones concedidas en casos anteriores [, ya que éstas] constituyen un punto de partida y referencia útil para pasar juicio sobre las concesiones otorgadas por el foro primario. Ello es así [,] aun cuando reconocemos que no existen dos casos exactamente iguales y que cada caso es distinguible según sus circunstancias particulares. En todo caso, estas compensaciones otorgadas en casos anteriores deben ajustarse a su valor presente". ***Santiago Montañez v. Fresenius Medical***, 195 DPR 476, 491 (2016). Luego, el tribunal sentenciador deberá tomar ante su consideración las circunstancias particulares del caso ante el *foro a quo*. ***Mena Pamias v. Jiménez Meléndez***, supra, pág. 770. Ciertamente resulta de utilidad casos similares, no obstante, no deben considerarse precedentes obligatorios. ***Santiago Montañez v. Fresenius Medical***, supra, pág. 491.  Nuestro más alto foro ha expresado que el TPI está en mejor posición que los tribunales apelativos para evaluar la estimación y valorización de daños, pues son los que tienen contacto directo con la prueba. ***Blás v. Hosp. Guadalupe***, 146 DPR 267, 339 (1998). De igual modo, este ejercicio de valorización de daños tiene cierto grado de especulación y elementos subjetivos como la discreción y el sentido de justicia y conciencia humana del juzgador

de los hechos. ***Santiago Montañez v. Fresenius Medical***, supra, pág. 490. Por lo tanto, los tribunales apelativos no intervendrán con la decisión que emitan los foros primarios a menos que las cuantías concedidas sean ridículamente bajas o exageradamente altas. ***Santiago Montañez v. Fresenius Medical***, supra, pág. 490; ***Blás v. Hosp. Guadalupe***, supra, pág. 339.

**F.**

El conocimiento judicial es un medio de prueba que pretende establecer un hecho como cierto sin la necesidad de presentar evidencia. ***UPR v. Laborde Torres y otros I***, 180 DPR 253, 276 (2010) citando a E.L. Chiesa, Tratado de Derecho Probatorio: Reglas de Evidencia de Puerto Rico y Federales, [ed. de autor], 1998, T. II, Sec. 13.1, pág. 1129. Por lo que, si un tribunal toma conocimiento judicial de un hecho adjudicativo, significa que ese hecho es aceptado como si fuese cierto, sin que la persona que lo ofrece presente prueba de su veracidad y se presumirá que la cuestión es tan notoria que no está en disputa. Íd., pág. 277. Independientemente de lo establecido, esto no impide que la parte contraria ofrezca prueba en contrario. Íd.

La Regla 201 de Evidencia de Puerto Rico, *supra,* establece en lo pertinente:

> (A) Esta regla aplica solamente al conocimiento judicial de hechos adjudicativos.
>
> (B) El tribunal podrá tomar conocimiento judicial solamente de aquel hecho adjudicativo que no esté sujeto a controversia razonable porque:
> > (1) Es de conocimiento general dentro de la jurisdicción territorial del tribunal, o
> > (2) es susceptible de corroboración inmediata y exacta mediante fuentes cuya exactitud no puede ser razonablemente cuestionada.
>
> (C) El tribunal podrá tomar conocimiento judicial a iniciativa propia o a solicitud de parte. Si es a solicitud de parte y ésta provee información suficiente para ello, el tribunal tomará conocimiento judicial.
>
> (D) Las partes tendrán derecho a ser oídas en torno a si procede tomar conocimiento judicial. De no haber sido notificada oportunamente por el tribunal o por la parte promovente, la parte afectada podrá solicitar la oportunidad de ser oída luego de que se haya tomado conocimiento judicial.

(E) El tribunal podrá tomar conocimiento judicial en cualquier etapa de los procedimientos, incluyendo la apelativa.

(F) En casos criminales ante jurado, la jueza o el juez instruirá a las personas miembros del jurado que pueden, pero no están obligados a aceptar como concluyente cualquier hecho del cual haya sido tomado conocimiento judicial.

Nuestro Tribunal Supremo ha expresado que bajo las disposiciones de esta regla los foros sentenciadores pueden tomar conocimiento judicial de "los procedimientos celebrados y de la sentencia o resolución dictada" sobre cualquier causa seguida en el mismo tribunal o en otro tribunal dentro de la jurisdicción de este. ***Asoc. de Periodistas v. González***, 127 DPR 704, 714-715. Esto es así pues al "tratarse de hechos cuya comprobación o determinación puede efectuarse de forma exacta e inmediata (sólo hay que acudir a la secretaría del tribunal en cuestión), es innecesario exigir en estos casos que se presente evidencia formal de los mismos". Íd.

**IV.**

En el caso ante nos, la parte apelante alega como, primer señalamiento de error, que el TPI erró como cuestión de derecho en sus determinaciones y conclusiones sobre la prueba pericial y valorización de daños. Como segundo señalamiento de error, o en la alternativa, sostiene que el TPI erró al no conceder ciertas cuantías, que alegadamente, fueron debidamente evidencias durante el juicio, las cuales son independientes a los demás señalamientos de error. Por estar íntimamente relacionados ambos señalamientos, procedemos a discutirlos conjuntamente. Tras un análisis objetivo, sereno y cuidadoso del expediente y de la prueba documental, adelantamos que el TPI no incurrió en error en ninguno de ambos señalamientos.

Como cuestión de umbral aclaramos que, en nuestro ordenamiento jurídico es norma reiterada que los foros apelativos debemos brindar total deferencia a las determinaciones de hechos y la adjudicación de credibilidad realizadas por el TPI, salvo que

demuestre la existencia de error manifiesto, pasión, prejuicio o parcialidad. Véase, ***Rivera Figueroa v. Autoridad de Acueductos y Alcantarillas de Puerto Rico***, supra, pág. 356; ***Flores v. Soc. de Gananciales***, supra. No obstante, cuando las conclusiones de hecho del TPI se fundamentan principalmente en prueba pericial o documental, los foros apelativos nos encontramos en la misma posición que el tribunal sentenciador, lo que nos faculta a adoptar nuestro propio criterio en la apreciación de la prueba y evaluación de la prueba pericial, y hasta para descartarla, aun cuando esta resulte técnicamente correcta. Véase, ***Municipio de Loíza v. Sucns. De Suárez et al.***, supra.

En otros términos, las Reglas de Evidencia de Puerto Rico, *supra*, disponen que cuando el conocimiento científico, técnico o especializado le pueda ser de asistencia a un juzgador de hechos, para poder entender la prueba presentada o determinar un hecho en controversia, una persona testigo que ha sido capacitada como perito podrá testificar en forma de opiniones o de otra manera. Véase, Regla 702 de Evidencia, *supra*, R. 702. El valor probatorio de dicho testimonio dependerá, entre otros factores, de: (a) si se fundamenta en hechos o información suficientes; (b) si constituye el producto de principios y métodos confiables; (c) si dichos principios y métodos se aplicaron de manera adecuada a los hechos del caso; (d) si el principio subyacente goza de aceptación general en la comunidad científica; (e) las credenciales o calificaciones de la persona perita; y (f) la posible existencia de parcialidad.

Luego de examinar la voluminosa TPO, los argumentos de las partes, la prueba documental, así como la totalidad del expediente, no surge que el foro primario haya incurrido en error, prejuicio o parcialidad en la evaluación de la prueba presentada. Coincidimos con el TPI, en que la estimación presentada por la parte apelada fue

más razonable que de la parte apelante, contrario a lo que argumenta la parte apelante.

Esta sostiene, además, que el perito de MAPFRE era ingeniero eléctrico, no un ingeniero civil, carecía de formación y experiencia necesaria para la evaluación de daños por viento en estructuras de varios niveles, como el Condominio Monte Real. Alegó que solo inspeccionó dos de los apartamentos, y no preparó ni verificó el estimado de costos, así tampoco, verificó la confiabilidad de su contenido. En contraste, alegó que los peritos del Consejo tenían amplia experiencia en evaluaciones y estimación de daños similares en Puerto Rico, y otras jurisdicciones de los Estados Unidos, realizando inspecciones exhaustivas de toda propiedad. En apoyo, citó **Dye-Tex P.R., Inc. v. Royal Ins. Co., PR,** 150 DPR 658, 664 (2000), donde se reconoció que *"la especialidad de un perito en cierta área puede ser decisiva en cuanto al valor probatorio de su testimonio."*

De igual modo, sostienen que el informe del Ing. Rosario careció de análisis de causalidad mientras que los peritos del Consejo presentaron un análisis detallado y documentado, con costos, fotografías, notas de campo y códigos de construcción siguiendo metodologías aceptadas para restaurar la propiedad a su condición pre-pérdida. A diferencia del Ing. Rosario, quien no preparó ni verificó el estimado de reparación, los peritos del Consejo incluyeron todos los costos necesarios, y acreditaron, mediante informes y evidencia pericial, la magnitud y naturaleza de los daños causados por el huracán María en el Condominio Monte Real. Sostienen, además que, el TPI erró al valorar la credibilidad de los peritos del Consejo en su *"demeanor"*, ya que el comportamiento no sustituye la evaluación del contenido de sus testimonios.

Coincidimos con el TPI, en que el estimado de la parte apelada resulta más razonable y confiable que el de la parte apelante. No nos

persuade la metodología de extrapolación,[42] utilizada para estimar daños en apartamentos que no fueron inspeccionados físicamente, máxime cuando los propios peritos de la parte apelante, el Sr. Thomas Irmiter y el Ing. Roberto López Esquerra, reconocieron que la inspección visual o física ofrece resultados más precisos y confiables.[43]

Por otro lado, consideramos adecuada y razonable la metodología empleada por ROV y su perito, el Ing. William Rosario Chárriez, para estimar los daños. Metodología que se basó en la observación directa de los daños, excluyéndose así aquellos para los cuales no existía prueba visible o verificable. Coincidimos con el TPI en que no se requiere experiencia en la construcción o en ingeniería para determinar los daños causados por el paso del huracán María. Por tanto, entendemos que, en el presente caso, no era necesario el conocimiento especializado que alega la parte apelante.

En otra línea, como hemos expresado anteriormente, la valorización de daños tiene cierto grado de especulación y discreción del juzgador de los hechos. Por lo tanto, los tribunales apelativos no intervendrán con la decisión que emitan los foros primarios a menos que las cuantías concedidas sean ridículamente bajas o exageradamente altas. Santiago *Montañez v. Fresenius Medical*, supra, *Blás v. Hosp. Guadalupe*, supra. Tras un pormenorizado análisis de la TPO y de las determinaciones de hechos en la *Segunda Sentencia Enmendada*, concluimos que el TPI actuó correctamente al incluir ciertos costos del estimado presentado por la parte apelante para adjudicar un mayor valor a las reparaciones en el estimado de MAPFRE. Dado que, ni el Sr. Joan Fernández, quien preparó dicho estimado ni los inspectores de ROV que

---

[42] Véase, la Transcripción de la Prueba (TPO), del 8 de agosto de 2024, pág.111, línea 8 a la 13.
[43] Íd. del 5 de agosto de 2024, pág.68, línea 1 a la 25. Del 16 de agosto de 2024, pág. 62, línea 20 a la 25, a la pág. 63, línea 1 a la 25.

recomendaron las partidas, testificaron en el juicio. Igualmente, coincidimos en que el TPI actuó correctamente al excluir aquellas partidas que no resultan necesarias ni obligatorias para las reparaciones recomendadas al Consejo.

Del *Informe de Conferencia con Antelación al Juicio*, surge que el señor Omar Acevedo Avilés fue anunciado como testigo en su calidad de ajustador de MAPFRE, para testificar sobre el manejo de la reclamación, los documentos del expediente, los términos y condiciones de la póliza y el proceso de ajuste.[44] Del mismo modo, según surge de la TPO, el señor Acevedo Avilés revisó la reclamación presentada por World Claim, realizó el ajuste correspondiente a la reclamación judicial del Condominio Monte Real.[45] Asimismo, testificó que la valorización de los daños se hace al bajo el costo actual (ACV) al momento de la pérdida, mientras que la cubierta de "replacement cost" constituye una condición adicional en la forma.[46] Igualmente, fue quien preparó el ajuste para la oferta de pago .[47] Así además, fue el responsable de preparar el ajuste para la oferta de pago tomando en consideración el estimado presentado por ROV, y las condiciones y deducibles de la póliza con el fin de obtener el ajuste neto o pago neto de la reclamación.[48]

Debemos de señalar, además, que la parte apelante solicitó que se tomara conocimiento judicial de la sentencia emitida por el TPI en *Consejo de Titulares del Condominio Playa Azul II v. MAPFRE Praico Ins. Co.*, Caso Civil Núm. LU2019CV00216. La parte apelante alega que su reclamación es similar a la de *Playa Azul II*, particularmente en lo relacionado con a las partidas para el arreglo o reemplazo de ventanas, puertas corredizas, techos y otros elementos comunes. No obstante, al no tratarse de una *Sentencia*

---

[44] Véase, Apéndice del Recurso de Apelación Civil, pág. 124.
[45] Véase, la TPO del 20 de agosto de 2024, pág.37, línea 13 a la 19.
[46] Íd., pág.64, línea 7 a la 25.
[47] Íd., pág.97, línea 4 a la 7.
[48] Íd., pág.104, línea 4 a la 19.

final y firme, dado que MAPFRE sostuvo haber presentado una Moción de Reconsideración, por existir controversias, no se cumplen los criterios de la Regla 201 de Evidencia para tomar conocimiento judicial.

Del mismo modo, luego de evaluar el expediente judicial, la *Segunda Sentencia Enmendada,* la TPO y los argumentos de las ambas partes concluimos que el TPI no erró al determinar que MAPFRE actuó de buena fe y que no hubo incumplimiento negligente, por lo que no procede la indemnización por daños contractuales. Se presume la buena fe de MAPFRE ante la ausencia de prueba en contrario, y el expediente demuestra que se acreditó la existencia de justa causa para la demora. Enfatizamos que, en acciones contractuales, el peso de la prueba recae sobre la parte demandante, quién debe demostrar el alegado incumplimiento doloso o culposo contractual y los daños sufridos como consecuencia de estos actos. En este caso, la parte apelante no logró acreditar el incumplimiento de MAPFRE, así tampoco los alegados daños sufridos en el manejo de su reclamación.

Tras evaluar minuciosamente los testimonios vertidos ante el TPI, y el expediente judicial, no surge que el TPI haya errado en sus determinaciones, conclusiones de derecho y valorización de daños a base del ajuste realizado por el señor Acevedo Avilés, ni que haya cometido error manifiesto, ni actuado con prejuicio, ni con parcialidad.[49] Muchos menos, erró en no conceder partidas adicionales. Entendemos que las partidas concedidas por el TPI fueron razonables y conforme a derecho.

En cuanto al tercer y cuarto señalamiento de error, por estar relacionados, los discutiremos conjuntamente y confirmamos la determinación del foro primario. Según es sabido, una parte puede

---

[49] Véase, Entrada Núm.306 en SUMAC-TPI

acumular varias determinaciones interlocutorias del foro primario en un mismo recurso apelativo, siempre y cuando se presente oportunamente. ***Silva Barreto v. Tejada Martell, 199 DPR 311,*** 321 (2017). De conformidad a nuestro ordenamiento jurídico, cualquier parte litigante goza de un término de treinta (30) días para solicitar la revisión de órdenes interlocutorias emitidas por el TPI. Dicho término es uno de cumplimiento estricto, y comienza a transcurrir a partir del archivo en autos de copia de la notificación de la determinación. En el presente caso, la parte apelante recurre de dos (2) dictámenes interlocutorios emitidos por el TPI, respecto de los cuales plantea los siguientes señalamientos de error: 1) en su tercer señalamiento de error, la aparte apelante sostiene que el TPI erró al no conceder costas y honorarios de abogados en virtud de la Regla 34.4 de Procedimiento Civil, *supra*, por lo que solicita a este Tribunal revoque parcialmente la *Resolución* dictada por el foro primario, y 2) en su cuarto señalamiento de error, alega que erró el foro sentenciador al no conceder costas y honorarios de abogados al amparo de la Regla 35.1 de Procedimiento Civil, *supra*.

En cuanto al tercer señalamiento de error, según consta en el expediente, el 29 de julio de 2024, el Consejo solicitó que se tuvieran por autenticadas las fotografías mediante el mecanismo de declaración jurada, conforme a la Regla 902 (K) de Evidencia, *supra*, y que MAPFRE reembolsara los gastos y honorarios de abogado, bajo la Regla 34.4 de Procedimiento Civil, *supra*, por su alegada negativa a autenticar fotos. El 1 de agosto de 2025, MAPFRE se opuso alegando que las fotografías no constituían un "récord de negocios", siendo el proceso adecuado presentar al testigo a declarar en juicio, y que el declarante carecía de conocimiento sobre las fotografías, ya que no fue quien tomó las mismas ni participó en la inspección de todas las áreas. Consecuentemente, el 2 de agosto de 2024, el TPI emitió una *Resolución* en la que declaró No Ha Lugar a

la solicitud de costas y honorarios de abogados bajo la Regla 34.4 de Procedimiento Civil, *supra*. Ahora bien, de una lectura cuidadosa, el TPI resolvió considerar autenticadas las fotografías con número de estampilla Monte_Real002517 al Monte_Real007067 por cumplirse con la Regla 902 de Evidencia"[50]

En vista de ello, no surge del expediente que la parte apelante haya presentado una Moción de Reconsideración luego de ser notificada sobre dicha determinación. Asimismo, no consta que haya especificado los gastos incurridos en el testimonio del señor Dort Rothafel, ni que haya solicitado dichos honorarios en el Memorando de Costas presentado el 28 de octubre de 2024.[51] Tampoco, surge que tales partidas sean parte de la *Segunda Sentencia Enmendada* de la cual recurre ante este foro.

En segundo lugar, en cuanto al cuarto señalamiento de error, del mismo modo surge del expediente que, luego de dictada la *Segunda Sentencia Enmendada* por el TPI, el 6 de diciembre de 2024, MAPFRE presentó un "Memorando de Costas y Solicitud de Remedios a tenor a la Regla 35.1 de Procedimiento Civil". Luego, el 16 de diciembre de 2024, la parte apelante presentó la *Oposición e Impugnación a "Memorando de Costas y Solicitud de Remedios a tenor con la Regla 35.1 De Procedimiento Civil"*. Consecuentemente, el 20 de diciembre de 2024, el TPI dictó una *Resolución* mediante la cual concedió las costas y honorarios, a favor de la parte apelante, al amparo de la Regla 44.1 de Procedimiento Civil, *supra*, por la suma de $9,487.27. Dicho monto sería descontado de la suma de $15,365.74 concedida a favor de MAPFRE conforme a la Regla 35.1 de Procedimiento Civil, igualmente

---

[50] Véase, Entrada Núm. 323 en SUMAC-TPI.
[51] Véase, Entrada Núm. 360 en SUMAC-TPI.

otorgada en dicha *Resolución.* Asimismo, del expediente no se desprende que la parte apelante haya solicitado la reconsideración de dicha *Resolución*; por el contrario, no es hasta el 7 de marzo de 2025, que mediante su recurso de *Apelación,* y por primera vez, recurre de tal determinación.

Por otra parte, de una lectura cuidadosa del expediente surge que, la parte apelante no demostró justa causa para la presentación tardía de la revisión de las resoluciones recurridas. Conforme a **Soto Pino v. Uno Radio Group,** 189 DPR 84, 92 (2013), es deber de la parte acreditar la existencia de justa causa, aun sin requerimiento del tribunal. Consecuentemente, luego de un análisis objetivo, sereno y cuidadoso del expediente, al presentar el tercer y cuarto señalamiento de error fuera del término aplicable, este Tribunal carece de jurisdicción para atenderlos.

Como quinto señalamiento de error, la parte apelante sostiene que erró el TPI al no conceder costas y honorarios de abogados bajo el Artículo 27.165 del Código de Seguros de Puerto Rico, *supra.* No obstante, tras examinar el ordenamiento jurídico vigente, concluimos que el TPI actuó correctamente al dejar sin efecto la causa de acción presentada por la parte apelante al amparo de dicho artículo. El más alto foro, ha reiterado que la causa de acción para reclamar honorarios de abogado, tanto bajo el Artículo 27.164 como bajo el Artículo 27.165 del citado Código, procede únicamente cuando la aseguradora no ha subsanado la controversia dentro del término de sesenta (60) días dispuesto en dicho estatuto.

En consecuencia, si la acción civil se presenta antes de que transcurra el referido término, el tribunal carece de jurisdicción para atender la reclamación.

Tomamos conocimiento judicial de la petición presentada por la parte apelante respecto a ***Tolbert v. Cooperativa de Seguros Múltiples de Puerto Rico***, *supra,* donde el tribunal federal, eximió al demandante de cumplir con los requisitos del Artículo 27.164 del Código de Seguros, *supra,* para reclamar honorarios bajo del Artículo 27.165, del referido código, *supra.* Criterio distinto al adoptado por nuestro Tribunal Supremo en los casos de ***Consejo Titulares del Condominio Playa II v. MAPFRE,*** *supra* y ***Con. Tit. 76 Kings Court v. Mapfre,*** 208 DPR 1018 (2022).

En el presente caso, la acción civil fue presentada el 18 de septiembre de 2019, un (1) día antes de presentar el Formulario de Notificación requerido. Conforme a la doctrina de entera fe y crédito aplicamos lo resuelto por nuestro máximo foro en ***Consejo Titulares del Condominio Playa II v. MAPFRE,*** *supra,* donde resolvió que la causa de acción bajo el Artículo 27.165, *supra,* solo surge cuando la aseguradora no subsana el incumplimiento dentro del término de sesenta (60) días. Concluimos, que la parte aquí apelante incumplió con los requisitos jurisdiccionales previstos por el Código de Seguros para presentar una causa de acción al amparo del Artículo 27.165, *supra.* En consecuencia, no encontramos razón para intervenir con la determinación del foro primario, al ser correcta en derecho. El foro de primera instancia no incurrió en ninguno de los errores señalados.

**IV.**

Por los fundamentos antes expuestos, confirmamos el dictamen apelado.

Lo acordó el Tribunal y lo certifica la Secretaría del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones